## THE STATE ex rel. McNAMEE et al. v. STOBIE et al.

### In Banc, February 26, 1906.

1. **PROHIBITION: Against Judicial Officer: Copy of Files and Process.** It is more satisfactory and more in harmony with the usual and ordinary practice, where an application is made to the Supreme Court requesting an extraordinary writ of prohibition prohibiting a justice of the peace from acting or proceeding in either a civil or criminal case, to accompany the petition with a copy of the files and process which furnish the basis of his assumption of jurisdiction.

2. ———: ———: ———: **Absence: Presumption of Jurisdiction.** In the absence of the complaint which was the basis of the action of the justice of the peace in issuing his warrant for the arrest of relators, it will be assumed that the complaint was one in a criminal prosecution under the laws of this State, and that the justice had jurisdiction over the same.

3. ———: ———: **Complaint: Arrest: Escape.** It is not essential to the issuance of a warrant by the justice for the arrest of an accused, that he should be satisfied that the accused is about to escape and avoid arrest, but, under the terms of the statute, if he be satisfied that the accused has no known place of permanent residence or property in the county, he may issue the warrant.

4. ———: ———: ———: ———: **Admission in Petition.** An averment in the petition that the accused are members of the police force of the city of St. Louis will be held to be an admission that the accused are not permanent residents of St. Louis county.

5. ———: ———: ———: **Jurisdiction of Subject-Matter.** The filing of a formal complaint with the justice of the peace, charging the accused with having committed a crime in the township and county, gives him jurisdiction of the subject-matter.

6. ———: ———: ———: **Arrest: Residence: Satisfaction of Justice.** Where the statute requires the justice of the peace before issuing a warrant, upon the filing of a complaint, for the arrest of the accused, to be satisfied that the accused is about to escape or has no known place of permanent residence or property in the county, the Supreme Court will not, when appealed to for prohibition, compel him to be satisfied, or decide whether or not he was satisfied before issuing the warrant.

7. ———: **Justice of Peace: Warrant for Arrest: Satisfaction: Entry On Docket.** A justice of the peace is not required to make any entry on his docket evidencing his satisfaction that, or the reason why, the warrant for the arrest of the accused should issue without waiting for the prosecuting attorney to file an information, nor is he required to endorse his satisfaction upon the writ or execute any writing evidencing the same. [Criticising McCaskey v. Garrett, 91 Mo. App. 354.]

8. ———: **Jurisdiction.** Jurisdiction is authority to hear and determine the cause. It does not depend either upon the regularity of the exercise of that power or the rightfulness of the decision made.

9. ———: **Summation of Law on Subject.** The underlying principles applicable to the issuance of the writ of prohibition, as heretofore declared by this court, may be summarized as follows:

**First:** To authorize a party litigant to invoke the aid of a writ of prohibition it must appear, in the proceeding sought to be prohibited, either that the court or judge was assuming to exercise and apply judicial power not granted by law, or, in a proceeding properly within its jurisdiction, the court was assuming to apply judicial force in excess of its power and authority so to do.

**Second.** If the court has jurisdiction of the class of cases to which the proceeding sought to be prohibited belongs, and acquires jurisdiction of the subject-matter, the mere fact of defects in the petition or complaint by which the proceeding was inaugurated, will not authorize the issuance of a writ of prohibition.

**Third.** The court will not permit writs of prohibition to usurp the place of appeals, writs of error or writs of *certiorari*.

10. **ST. LOUIS POLICE: Power in St. Louis County: City Charter: Arrests.** The metropolitan police force of the city of St. Louis are not, under the Scheme and Charter, now vested with the same power and authority in the county as they have in the city. They are not vested with authority to make arrests in the county for crimes committed in the county.

11. ———: **City Charter: Subject to Laws.** The charter of the city of St. Louis in respect to the city's metropolitan police force is subject to the Constitution of the State and to laws subsequently passed by the General Assembly. And even if the Scheme and Charter vested the police of the city with power to make arrests in the county of persons in the county about to commit or having committed crimes in the county, that part of it, if in conflict with the laws of the State subsequently enacted or with the Constitution, becomes inoperative and of no

force and validity, for the duty of providing a metropolitan police force for large cities is imposed upon the State and not upon such municipalities any further than the State in its sovereignty may chose to delegate it to them.

12. ———: **City Charter: Repeal.** If power was ever vested by the Scheme and Charter in the police of the city of St. Louis to make arrests of persons in St. Louis county for crimes committed in the county, it was taken away by the act passed by the General Assembly of 1899, which repealed all prior acts on the subject of metropolitan police systems for the large cities, and while retaining many of the provisions of prior acts, nevertheless is an entirely new act. ·

13. ———: ———: ———: **Powers Given by Act 1899: Expressio Unius, Etc.** The act of 1899 authorizing the police of St. Louis to "arrest offenders within the boundaries of the city," etc., to arrest, upon process, in any part of the State "any person charged with the commission of crime within the city," and to arrest any person within the city limits "that they believe intends to commit a crime beyond the city limits," limited their power to make arrests, and, applying the maxim of *expressio unius exclusio. alterius est*, it gave them no power to make arrests of persons in St. Louis county for crimes committed there.

14. ———: ———: ———: **By Implication.** The rule that repeals by implication are not favored in the law, applies ordinarily to enactments by the same legislative body. Provisions of a city charter in conflict with a subsequent enactment of the General Assembly are invalid and inoperative, whether expressly repealed or not.

15. **ARREST: By Officers as Citizens: Prohibition.** The court in determining whether or not a temporary writ of prohibition applied for by police officers of St. Louis to restrain a justice of the peace from trying them for forcibly entering upon the premises of a jockey club in St. Louis county and for arresting persons therein selling pools and otherwise violating the law which makes pool-selling on horse-racing a felony, will not determine whether or not such officers, as citizens, had the right to make such arrests. That is a matter of defense upon the trial of the cause before the justice, and for this court to determine it in passing upon the right of the officers to the writ would be to determine that the arrested persons had committed a crime—a thing this court will not in prohibition do.

16. **PROHIBITION: Against Magistrate: Purposes of Prosecution: Jurisdiction: Demurrer.** The object and purpose of a prosecution begun against relators before a justice of the peace are not to be considered in determining his jurisdiction. And the jurisdiction of the justice over the criminal prosecution is in

nowise affected by an allegation in the petition in the prohibition proceeding that "the sole object and purpose of such criminal prosecution are to hinder, impede and obstruct relators in the performance of their duty as police officers, and to protect persons in the violation of the law," and by respondents' demurrer thereto.

17. ———: ———: Innocence: Inconvenience. The fact that relators may be innocent of any infraction of the law affords no reason why the court should issue its writ of prohibition against a justice of the peace having jurisdiction of the subject-matter with whom a complaint has been filed charging them with the commission of a crime. Nor does the fact that it may greatly inconvenience relators to make their defense through the courts do so.

18. COURTS: Decisions to Meet Special Conditions. The law announced by the courts is not merely for a day. New principles should never be created or doubtful ones declared to meet the seeming demands and conditions surrounding any particular case.

19. ———: Judicial Legislation. Instances in which the law is inadequate to promptly meet and punish every wrong do not authorize the courts to remedy such defects by judicial legislation.

20. ———: Safety of People. The safety of the people, as well as the protection of their lives, liberty and property, must depend upon the full recognition by the courts of the country of the fundamental principles of government, as well as the law itself, and upon a strict adherence to such principles and a fearless and impartial application of them to the administration of justice.

### Per Marshall, J., dissenting, with whom
### Valliant, J., concurs.

1. PRACTICE: Pleading and Demurrer. The rule deducible from the statutes and decisions is: that pleadings must be read liberally; must not be sourly construed; must be taken in the sense fairly intended by the pleader; and when they are attacked by demurrer all the facts well pleaded and all facts which may fairly be deducible from the facts pleaded, are confessed, and the courts must lean towards rather than against the pleader.

2. PROHIBITION: Jurisdiction: Exception. There are well-recognized exceptions to the general rule of law that when a court has jurisdiction over a class of cases to which the particular case belongs prohibition will not lie.

194 Sup—2

3. ———: ———: ———: **Trespass: Civil Action: Instituted by Party not Injured.** The relators, police officers of St. Louis, under an order of the Governor to put a stop to lawlessness in St. Louis county, and to arrest any persons engaged at a race track in said county in pool-selling, book-making and registering bets, in defiance of a recent enactment of the General Assembly, went to the race track, unclasped the chain at the entrance, and proceeded to arrest persons therein. Thereupon one Mathews, whose relation to the matter, if any, is not shown, filed a complaint before a justice of the peace charging relators with trespass under section 4573, Revised Statutes of 1899, which says that if any person shall throw down the bars, etc., to any enclosure not his own, he shall pay to the party injured five dollars, etc. Thereupon relators brought prohibition in this court against the justice, constable and complainant, to prohibit them from proceeding to prosecute said suit, etc. *Held*, first, that the proceeding sought to be prohibited is not a criminal prosecution and is not to try a misdemeanor or a crime of any kind, but a penal suit, and all proceedings for enforcing it are civil; second, that no person can proceed or has a right to proceed under the statute except the party injured; and, third, the justice of the peace had no jurisdiction to entertain or attempt to determine the pretended case instituted before him by Mathews, and the writ should go.

4. ———: ———: **Sham Prosecution: Brought to Obstruct Enforcement of Law.** A prosecution, charging police officers with committing a trespass, brought, not by the party injured or the owner of the premises forcibly entered, but by a stranger thereto and in the interest of the owner, for the purpose of obstructing, hindering and delaying the enforcement of the law against violators thereof carrying on their prohibited acts within such premises, is a sham prosecution, and should be so considered when such police officers apply to a superior court for a prohibition to prohibit its further prosecution before the inferior court.

5. ———: ———: ———: **Conflict of Authority: Unenforced Criminal Law.** Where the constituted authorities of a county are unable to perform their duties, or are recreant in their duties, and the laws of the State are openly defied and violated, and the prosecution for trespass against relators, police officers of St. Louis, is instituted to thwart, hinder and obstruct them in their efforts, under the direction of the Governor, to enforce the law, and the petition states such to be the purpose of the prosecution, and the issue is met by a demurrer, and the writ of prohibition is the only effective and speedy method provided by law to preserve the peace of a large community and to prevent danger of conflict between

them as subordinate police officers and the local constabulary, a condition is presented which imperatively demands extraordinary remedies, and the case falls within the exceptions to the general rule in reference to prohibition.

6. ————: **St. Louis Police: State Officers: Governor's Constabulary.** Section 25 of the act of 1899 makes the members of the police force of St. Louis officers of said city, "under the charter and ordinances thereof," and "also officers of the State of Missouri," and declares that they "shall be deemed and taken [as such] in all courts having jurisdiction of offenses against the laws of this State or the ordinances of said city." *Held,* first, that the preservation of the public peace and order in every part, division and subdivision of the State is a governmental duty which devolves upon the State and is an inherent attribute of government, and the State is charged with the duty of preserving the same independent of and superior to the wishes even of the people of a particular locality, and where the people of a county are unable to protect themselves, by reason of the inefficiency or recreancy of their local officers, the duty to enforce the criminal laws and preserve order there rests upon the State. *Held,* second, that this law makes the police officers of said city a State constabulary, distinguishable from the military arm of the State, and as the Constitution devolves upon the Governor the duty to "take care that the laws are executed" and makes him "a conservator of the peace throughout the State," the duty devolves upon him primarily, acting through the board of police commissioners of the city, to use these police officers of St. Louis city to enforce the criminal laws and the police powers of the State in the localities outside of the city, whenever the local machinery of government is inadequate or insufficient to enforce them and preserve order. *Held,* third, that the Governor is the exclusive judge of whether or not the exigency of the condition demands such action on his part. *Held,* fourth, that the writ of prohibition will not lie against the Governor in matters pertaining to his executive functions and duties.

7. ————: ————: ————: **Repeal of Charter Provisions.** Whether or not the provision of the Scheme and Charter of St. Louis, giving to the metropolitan police force of the city "the same power and jurisdiction in St. Louis county, as constituted by this Scheme, as now provided by law," was repealed by the act of the General Assembly of 1899, is immaterial, in view of the fact that that act made them "officers of the State."

8. ————: ————: ————: ————: **Repeal by Implication.** It was the purpose of the Scheme separating St. Louis city and county to preserve to the police of the city the same power and jurisdiction they had formerly had by legislative enactment in

St. Louis county, and the Constitution expressly declared that when that Scheme was adopted by the voters it should become the organic law of the county, and as section 14 of the Scheme gave to the police of the city "the same power and jurisdiction in the county as now provided by law," and as there is nothing in the act of 1899 repugnant to or inconsistent with that provision, it cannot be held that that act took away from the police of the city the power to make arrests in the county or by implication repealed the provisions of the Scheme and Charter.

## Prohibition.

DEMURRER TO PETITION SUSTAINED.

*Herbert S. Hadley,* Attorney-General, and *W. M. Williams* for relators.

(1) (a) It stands confessed that the object and purpose of the proceedings before Justice Stobie were not to punish relators for a trespass upon the property of the Delmar Jockey Club, or to hold them to trial for the commission of an alleged misdemeanor, in unclasping or throwing down the chain across the entrance to said grounds, but that said proceedings were begun and prosecuted "to protect from arrest persons engaged upon said Delmar race track in violating the act of the General Assembly of the State of Missouri, approved March 21, 1905, to prohibit bookmaking and pool selling, and to prescribe a penalty therefor." (b) It is a grievous abuse of judicial power, and an unwarranted and unlawful exercise of authority, and in excess of his rightful jurisdiction, for a justice of the peace to issue a warrant for officers or citizens, in order to prevent them from arresting criminals and to enable such criminals to continue in the commission of felonies without interference or molestation. Fellows v. Goodman, 49 Mo. 62; Dougherty v. Snider, 97 Mo. App. 501. (2) The writ of prohibition is as available to keep a court within the limits of its rightful power and authority in a particular case as it is to prevent the exercise of

jurisdiction over a cause not given by the laws of the State to its consideration. While the main office of the writ is to keep the court, to which it is addressed, within the bounds of its jurisdiction, yet it is sometimes used in the exercise of a proper discretion " to keep a court from doing what it has no lawful authority to do in a case the general nature of which is within its jurisdiction." State ex rel. v. Sale, 188 Mo. 496.; State ex rel. v. Elkin, 130 Mo. 105; State ex rel. v. Wear, 135 Mo. 256; State ex rel. v. Eby, 170 Mo. 497; State ex rel. v. Cline, 85 Mo. App. 628; Quimbo v. People, 20 N. Y. 541. (3) It stands admitted that at the time relators entered the Delmar race track persons were engaged in committing felonies therein. Members of the metropolitan police of the city of St. Louis had authority to arrest such persons in St. Louis county, and in entering the premises of the Delmar Jockey Club for that purpose, they committed no offense, and a prosecution based upon such act, was without authority of law. Sec. 14, Scheme and Charter, 2 R. S. 1899, p. 2467; 2 R. S. 1889, p. 2196, sec. 14; 2 R. S. 1889 p. 2199, sec. 18; 2 R. S. 1889, p. 2200, sec. 25; 2 R. S. 1889, p. 2201, sec. 35. (4) Section 14 of the Scheme for the separation of the city and county of St. Louis was neither repealed nor rendered inoperative by the act of 1899, establishing a metropolitan police in cities of 300,000 inhabitants or more, and prescribing the duties and powers of said police within such cities. The Constitution authorized the adoption of the plan of separation and declares that "such Scheme shall become the organic law of the county and city." There is no inconsistency between the general act of 1899 declaring the powers and duties of the police in cities of 300,000 inhabitants or more, and the special provision concerning the authority in St. Louis county of the metropolitan police of the city of St. Louis. State ex rel. v. St. Joseph's Convent, 116 Mo. 580; State v. Green, 87 Mo. 583; State ex rel. v. Field, 99 Mo. 352; Kansas City v. Marsh Oil Company,

140 Mo. 459.  (5)  It being confessed that persons were committing felonies within the enclosure of the Delmar Jockey Club, relators had the right as private citizens, without reference to their official positions, to arrest such persons, and in entering the enclosure for that purpose, they violated no law, and did not subject themselves to criminal prosecution therefor.  State v. Albright, 144 Mo. 638; Burns v. Erben, 40 N. Y. 466; 2 Ency. Law (2 Ed.), 884-5.  (6)  The petition charges, and the demurrer confesses, that the justice issued the warrant for the arrest of the relators before any investigation of the facts by the prosecuting attorney, and without the filing of an information by that officer, notwithstanding the justice had no reason to believe the relators were likely to try to escape or avoid prosecution. The justice had no lawful authority or jurisdiction to issue a warrant against the relators under said circumstances.  R. S. 1899, sec. 2752; McCaskey v. Garrett, 91 Mo. App. 354.  (7)  The affidavit filed with the justice of the peace, according to the allegations of the petition, did not show upon its face that relators had committed any offense under the laws of this State, and the justice had no lawful authority to issue a warrant based thereon.  The affidavit was insufficient to bring the proceeding within section 4573, relied upon by the respondents as their authority for instituting and entertaining a criminal charge of trespass against the relators.  State v. Grubb, 71 Mo. App. 214.  (8)  The Constitution gives this court superintending control over all the inferior tribunals of the State.  The writ of prohibition is not confined to cases where there is an absolute want of jurisdiction, but it will lie where a court attempts to exercise its jurisdiction in a manner not authorized by law, and where an adequate remedy is not available by appeal or the usual and ordinary methods of procedure. It may be granted in the discretion of the court wherever the lower tribunal is proceeding in excess of its rightful authority and the other available remedies

"are insufficient to prevent immediate injury or hardship to the party complaining, particularly in criminal cases." 16 Ency. Pl. and Pr. 1131; State ex rel. v. Eby, 170 Mo. 527; Quimbo v. People, 20 N. Y. 542; Yearian v. Speris, 10 Pac. 616.

*Chester H. Krum, Henry S. Priest* and *Bond & Bond* for respondents.

(1) Assuming that police officers of the metropolitan police force of St. Louis were present in St. Louis county, under orders from the Governor, as alleged in the information, no warrant of law is shown by the information for such presence, and the averments of the information based on "orders" afford no justification for the forcible entry upon private premises, which the information shows was made by the relators. In no event would an order from the Governor afford an excuse for a trespass committed in St. Louis county by officers of the police force of the city of St. Louis. The information proceeds upon the false hypothesis, that under the conditions set out, the relators were justified by the order of the Governor. Obviously the theory is a mistaken one. (a) "The Governor shall take care that the laws are distributed and faithfully executed, and he shall be a conservator of the peace throughout the State." Constitution, art. 5, sec. 6. (b) "The Governor shall be commander-in-chief of the militia, . . . and may call out the same to execute the laws, suppress insurrection and repel invasion." Id. art. 5, sec. 7. (c) If it be conceded that "executed" is synonymous with "enforced," yet the mandate of the Constitution affords no warrant for the order of the Governor. The proposition involves consideration from two points of view: 1. The enforcement of the laws by the institution of ordinary proceedings. 2. The enforcement of the laws through the military arm of the State. But the order to descend upon the premises of

the Jockey Club proceeded upon the hypothesis of invoking the "military arm" of the State, as it is called, without the semblance of an appeal to ordinary, lawful and legitimate process. The order was not made in furtherance of the laws; it was made in violation and defiance of the laws. The ukase of the Governor, set out in the information, is recognizable as a merely declamatory fulmination, but it is not akin to the exercise of a legitimate prerogative, or to the discharge of a lawful obligation. The order is bombastic to the extremity of bombast; but purporting to be hurled against a state of lawlessness, it can only evoke from the law-abiding, regret that such a diatribe could find birth in Missouri and it can excite nothing but ridicule of its magniloquent periods and preposterous assertions. If the police force is part of the "military arm," which defendants deny, the information does not state facts which justified the order. It does not appear that the civil authorities had been rendered powerless to execute the laws, by resistance which they were unable to overcome. Chapen v. Ferry, 3 Wash. 386; Green v. State, 15 Lea 708. Upon the assumption, therefore, and this is a false assumption, that the police are a part of the military arm of the State, the bouleversement of the Governor in taking care that the laws were faithfully executed by resorting in the first instance to force, merely "upon information having come" to him of violations of law in St. Louis county, would be essentially ludicrous were it not evidential of a total perversion of gubernatorial prerogative. Thus, at the outset, the information shows that the relators proceeded without warrant of law, when, as a part of the so-called "military arm" of the State, they trespassed upon private premises under orders of the Governor, who was taking care that the laws of Missouri should be "faithfully executed." *Inter arma, silent leges.* (2) The Metropolitan Police Force of the city of St. Louis is not, by the Scheme separating the city and county, given the same jurisdiction in the

county as in the city. The information alleges that the entry upon the premises of the Jockey Club was made by the relators "acting by and under the order of the Governor of the State," and that they entered to arrest persons engaged in violating criminal laws, "as they were ordered and directed to do by the Chief Executive of said State." The question therefore is presented whether the police force of St. Louis have, as' the Executive puts it, the same jurisdiction in the county as in the city of St. Louis. (a) The defendants deny that, upon the showing made in the information, the police of St. Louis would be subject to the orders of the Governor, were the alleged situation of lawlessness existent in the city and not in the county; or that a forcible entry upon private premises could be justified because made under orders of the executive. This proposition need not be discussed, merely to meet the claim that the police were rightfully in the county, as determinable by the Scheme of separation, or some other law. In no event could the police of St. Louis properly be subject to orders of the Governor. The defendants now merely meet the information upon the "lofty and sounding phrases of the manifesto," that the police were rightfully in the county. (b) Neither the Scheme of separation nor any other statute or enactment confers upon the police of St. Louis the same jurisdiction in the county as in the city. What was the power and jurisdiction of the St. Louis police in the county, as then provided by law, or while this section of the Scheme subsisted? 1. By Act March 27, 1861 (Laws 1861, p. 448), it was provided: "In case they" (the St. Louis Police Board) "shall have reason to believe that any person within said city intends to commit any breach of the peace, or violation of law, or order beyond the city limits, any person charged with the commission of crime in the city of St. Louis, and against whom criminal process shall have issued, may be arrested upon the same in any part of this State by the police force created or

authorized by this act.'' Giving effect to the beginning of this provision, unintelligible though it is, the act provides: (a) That the police board may arrest in the city any person who is about, as they believe, to commit a breach of the peace, or violation of law beyond the city limits (b.) Where a person is charged with crime committed in the city, and criminal process (a warrant) has been issued against him, the police of St. Louis may arrest him in any part of the State. Familiar doctrines of exclusion limit the ''jurisdiction'' of the St. Louis police outside of the city to these provisions. *Expressio unius, exclusio alterius est.* 2. By Act March 13, 1867 (Laws 1867, p. 178), it was provided: '' The board'' (police board), ''whenever and for so long a time as may be necessary, is further authorized to appoint, mount and equip not more than twenty policemen for duty in the outskirts and open portions of the city and elsewhere in the city and county of St. Louis.'' The last act is the one expressly referred to in the Scheme. The original act confers whatever there is of jurisdiction outside of the city in those officers appointed for duty under the act creating the police force. Where, then, is found the jurisdiction asserted to exist, as applied to the relators? There is none; there was none. Their information, in this regard, confesses that they were trespassers *ab initio*. 3. The preposterous assertion of the proclamation, under which relators seek shelter, that the police of St. Louis have the jurisdiction claimed by reason of the Scheme of separation is further demonstrated by the fact (if anything further could be needed), that the act under which the police force now exists, in express terms, repealed the original police act of 1861 and all acts ''supplementary to and amendatory thereof.'' Laws 1899, p. 51. This statute repeals not only existing statutes, by its express terms, but by force of its enactment and scope repealed the provisions of the Scheme of separation upon which relators rely in their information: Ewing v. Hoblit-

zelle, 85 Mo. 64; Kennefick v. St. Louis, 127 Mo. 1; State
ex rel. v. Higgins, 125 Mo. 364; Spalding v. Brady, 128
Mo. 653. The legal consequence is, therefore, that the
information shows that the relators, so far from con-
serving, were violating the law, and that they were not
the less trespassers because an indulgent view will stop
short of characterizing them as marauders. (3) Inde-
pendently of propositions heretofore advanced, the in-
formation does not state facts constituting usurpation
of jurisdiction by the justice of the peace, or the con-
stable, but affirmatively shows that the defendant offi-
cers were discharging a duty imposed on them by law,
and proves, by its own averments, that nothing exists,
in law or fact, to warrant the writ of prohibition. 1.
Prohibition only lies to prevent usurpation of judicial
power. It will not lie to correct errors remediable on
appeal, or writ of error. These are fundamental propo-
sitions. 2. When any person has actual knowledge that
any offense has been committed that may be prosecuted
by information, he may make complaint verified by his
oath, setting forth the offense and file the same with the
justice having jurisdiction of the offense. R. S. 1899,
sec. 2749. This was done by the defendant Mathews.
The information does not allege that Mathews knew that
the offense had not been committed, or that he did not
believe that it had been committed; therefore, he did
know or did believe the offense had been committed.
He made complaint and verified it by his oath. The in-
formation does not set out the complaint, or show what
offence was complained of other than that it was a mis-
demeanor. It is not difficult to see that the offense was
clearly within section 4573, Revised Statutes 1899. This
question is not material at the present time. The infor-
mation avers, however, that the relators voluntary
threw down and opened the bars, or gates, of the in-
closure of the Jockey Club. It is not averred that they
did not leave them open. The complaint filed by Math-
ews, as the information thus affirmatively shows, was

based upon actual fact—a foundation even stronger than the statute requires. This, however, is not the test.  3.  Complaints subscribed and sworn to by any person competent to testify against the accused may be filed with any justice of the peace, and if he be satisfied that the accused is about to escape, or has no known place of permanent residence or property in the county likely to restrain him from leaving for the offense charged, the justice shall immediately issue his warrant and have the accused arrested and held until the prosecuting attorney shall have time to file an information. R. S. 1899, sec. 2750. This mandatory statute imposes a duty upon the justice.  He must issue a warrant, if he is satisfied, among other things, that the defendant has no known place of residence in the county.  The information shows that the relators accused by the complaint of Mathews did not live in the county.  The warrant at the hands of the justice was, therefore, commanded to be issued.  The information alleges that the justice knew that the acts of relators were done in the performance of their duty as officers, but this averment is overthrown by the fact that the relators were unlawfully undertaking to carry out orders unlawfully given them by the Governor.  The justice knew that they were trespassers when they entered the premises of the Jockey Club.  4.  When the justice issued his warrant, the defendant constable was bound to execute it, by arresting the relators in obedience to its mandate.  Prohibition is, therefore, invoked to reach this situation. 1.  Complaint verified by a person competent to testify is lodged with a justice, charging persons, not resident in the county, with a misdemeanor, alleged to have been committed in the county.  2.  In St. Louis county justices of the peace have jurisdiction to try all misdemeanors.  A justice, where the accused is not resident in the county, is required, upon verified complaint being made . to him, to issue his warrant for the arrest of the accused.  3.  Complaint having been made, the justice

issued his warrant to the constable, who was about to execute it when prohibition proceedings were begun and a provisional writ obtained. No clearer case for the denial of a peremptory writ could possibly be shown than appears on the face of the information. Nothing in the information shows that the justice did not have jurisdiction. Whether the prosecution could be maintained does not go to the question of power, or jurisdiction of the justice. This question is to be determined in the cases before the justice. Wilson v. Berkstretter, 45 Mo. 283; Bowman's Case, 67 Mo. 146; State ex rel. v. Railroad, 100 Mo. 59; State ex rel. v. Withrow, 108 Mo. 1; State ex rel. v. Scarritt, 128 Mo. 331; State ex rel. v. Zachritz, 166 Mo. 307; Schubach v. McDonald, 179 Mo. 163. The proper inquiry is, did the justice have jurisdiction of the general class of cases to which the particular case belongs, and not whether he had jurisdiction of the particular case. State ex rel. v. Smith, 104 Mo. 434; Wilson v. Berkstretter, 45 Mo. 283. If the exercise of jurisdiction was a mistaken one, such mistake does not afford ground for prohibition. State ex rel. v. Railroad, 100 Mo. 59. The contention in support of the writ proceeds upon the fallacious premises that jurisdiction results from the facts of each case and not from general provisions of law. Grant a peremptory writ and the consequences follow that prohibition is a remedy for erroneous views of the law by subordinate courts, a remedy to correct mistaken conclusions of fact by either the citizen or a subordinate court, and a remedy to prevent the discharge of a bounden duty imposed by the people upon officers, whom they have selected to bring criminals to justice by a resort to legal processes designated by the laws of the State.

FOX, J.— This is an original proceeding in this court. It is a petition or application by relators addressed to this court asking for the issuance of a writ of prohibition. The petition was filed by the relators

on July 28, 1905, and the grounds for relief and the particular relief sought are thus plainly stated:

"Come now the relators herein, George T. McNamee, Patrick McKenna, Con Meehan, Patrick Kirk, Henry Meyer, Sydney Sears, John Kavanaugh, John McCarthy, Timothy Danaher, George Williams, Thomas Keily, Frank McKenna, Gratiot Cabanne, R. L. Killian, Hugh McFarland, James Burke, George Greeley, Charles Madsen and James Hunt, and give the court to understand and be informed that said relators are now and were at all times hereinafter mentioned citizens of the State of Missouri and residents of the city of St. Louis therein; that said relator, George T. McNamee, is now and was at all of said times, a captain, the relator Patrick McKenna, a lieutenant, and each of the other relators a member of the metropolitan police force of the city of St. Louis, duly appointed, commissioned and qualified as such and are now officers of the State of Missouri; that respondent, Frank Stobie, was then and still is, an acting justice of the peace of Central township of St. Louis county, in the State of Missouri, and Fred Lenz, constable of said township.

"Relators further give the court to understand and be informed that Hon. Joseph W. Folk, Governor of the State of Missouri, by virtue of the authority vested in him by the Constitution and laws of the State of Missouri, on the 21st day of July, 1905, issued and delivered to Hon. A. C. Stewart, president of the Board of Police Commissioners of said city of St. Louis, a communication in words and figures as follows, to-wit:

" 'OFFICE OF THE GOVERNOR.

STATE OF MISSOURI.
*City of Jefferson.*

July 21, 1905.

" ' Hon. A. C. Stewart,
      President Board of Police Commissioners,
          St. Louis, Mo.

" 'Dear Sir:

" 'Information having come to me that a state of lawlessness exists in St. Louis county; that men backed by millions of wealth and political influence are openly committing felonies by registering bets on horse races; that dramshop keepers in flagrant defiance of the statutes keep their places open on Sunday; that men are openly held up and robbed in the orgies and the general debauchery following the violations of this law; that gamblers ply their trade uninterrupted and scoff at the authority of the State; that the laws of the State are nullified and the statutes of the State trampled in the dust, and the honor of the State assailed without interference or hindrance, and that the local officials either cannot or will not uphold the laws there:

" 'Whereas, such conditions cannot be tolerated in Missouri; and

" 'Whereas, it is the sworn duty of the executive to execute the laws of the State; and,

" 'Whereas, the metropolitan police force of the city of St. Louis is by the Scheme separating the city and county, which was voted upon by the people of the whole county in accordance with the Constitution, given the same jurisdiction in the county as in the city; and,

" 'Whereas, the Governor as the supreme conservator of the peace throughout the State has the right to call on the metropolitan police force as a part of the military arm of the State, to preserve peace and order and suppress outlawry:

" 'Now, therefore, in order to maintain the peace and dignity of the State and to preserve the majesty of the laws of the State, you are hereby directed to instruct the Chief of Police of the city of St. Louis to detail fifty officers or more for duty in St. Louis county with orders to proceed, with all convenient speed, to Delmar race track in said county of St. Louis, and there arrest any and all persons feloniously registering bets, and to seize and hold as evidence all money, papers and

paraphernalia connected with said felonies. When so arrested the felons will be taken by the officers before some justice of the peace, of the county and warrants sworn out for them, with the officers as witnesses, in the usual way. The arrests must continue from day to day so long as the felonies are committed. The officers should be further instructed to see that the dramshop laws and the gambling laws are observed and to close all dramshop found to be open contrary to the statute in such cases made and provided, and to arrest all persons found to be violating such laws. These outlaws, when so arrested, will be turned over to the sheriff, and warrants sworn out for them before a justice of the peace, in manner and form above set out. Every arrest should be by the officer who himself sees the crime committed, and by no other.

" 'Very respectfully,

" 'Jos. W. Folk, Governor.'

"That thereupon the Hon. A. C. Stewart, president of said Board of Police Commissioners, issued the following order to Hon. Mathew Keily, Chief of Police of said city of St. Louis, under whose orders the relators were acting in all of the matters hereinafter mentioned:

" 'July 23rd, 1905.

" 'Hon. Mathew Keily,
    Chief of Police,
        Four Courts, City.

" 'Sir:

" 'I herewith hand you a letter from the Governor of the State of Missouri concerning a state of lawlessness said to be existing in St. Louis county and requiring the aid of the police officers to suppress the same. Please give careful attention to the contents of the Governor's letter and comply therewith as promptly as possible.    A. C. Stewart,

" 'President of Police Board.'

"That thereupon the Hon. Mathew Keily, Chief of Police as aforesaid, ordered the relator George T. Mc-

Namee, as captain of said police force, to take with him the other relators herein and proceed to Delmar race track and there to carry out the orders contained in the communication from the Governor of the State of Missouri, as hereinbefore set out. The relators further give the court to understand and be informed that the 'Delmar Jockey Club' is a corporation duly created and organized under the laws of the State of Missouri, and was such at the times herein mentioned and that said corporation was the owner at said times and still is of the said Delmar race track; that said race track is partly in the city of St. Louis; that the line between the city and county of St. Louis passes through said track; that said corporation by its articles of association declares that one of the purposes of the said 'Delmar Jockey Club' is to own race tracks and grounds and to engage in pool-selling, book-making and registering bets on the exhibition of speed and on races at said tracks and premises and to let the right to others to do the same; that on the 16th day of June, 1905, the said Delmar Jockey Club was permitted and suffering pools to be sold and bets to be registered upon its race track upon races to be run thereon and has ever since continued so to do in direct violation of the act of the General Assembly of this State, entitled 'An act prohibiting book-making and pool-selling and prescribing a penalty therefor,' approved March 21st, 1905; that said book-making, pool-selling and registering bets were done on that part of said race track located in St. Louis county, but that the race track and the enclosure thereof extended into the city of St. Louis; that many persons were in the habit of going from the city of St. Louis to the said Delmar race track for the purpose of and were there engaging in book-making and selling pools and registering bets upon the races being run upon said track and were thereby committing felonies under the statutes of this State; that these facts were known to

the relator George T. McNamee and the other relators herein.

"And the relators further give the court to understand and be informed that heretofore, to-wit, on the 24th day of July, 1905, relators were informed and had good reason to believe and did believe that divers persons were engaged on that part of said Delmar race track located in the county of St. Louis, in book-making, and in recording and registering bets and in selling pools within the enclosure, booths and buildings of said Delmar Jockey Club, said bets being registered and pools sold upon the results of the trial of speed and power of endurance of beasts, which was to take place upon said Delmar race track, and the selling of said pools and the registering of said bets then and there being carried on constituted a felony under the laws of this State; that said registering of bets and pool-selling were done in the presence of some of the relators herein, and the said George T. McNamee, the captain in charge of the policemen at said race track, was informed thereof and was notified that persons within said enclosure were then in the act of violating the criminal laws of the State and that felonies were being committed within said enclosure; that thereupon he demanded admission into said enclosure for himself and the other relators herein, as officers and citizens of the State of Missouri, for the sole and only purpose of arresting and taking before the proper magistrate, to be disposed of according to law, such persons as might be engaged in the commission of said felonies therein, and that upon such permission being denied, the relators acting by and under the orders of the Governor of the State of Missouri hereinbefore set out, let down or unclasped the chain across the entrance of said race track in the county of St. Louis and the State aforesaid and went into said enclosure, without injuring said property, and for the sole purpose of arresting the persons engaged therein in violating the criminal laws of the State, as

they were ordered and directed to do by the chief execu-
tive of said State; that thereafter, to-wit, on the 24th
day of July, 1905, respondent William Mathews filed
an affidavit with the respondent Frank Stobie as justice
of the peace of Central township, in the county and
State aforesaid, charging relators with throwing down
and opening the gate at the entrance of said race track,
and then and there undertook to attempt to institute,
before said Stobie as such justice of the peace, a crimi-
nal prosecution as for a misdemeanor against the rela-
tors and each of them for their action as policemen
and officers of the State of Missouri in letting down said
chain or unclasping the same in order to enter said en-
closure to make the aforesaid arrests; that at the time
said affidavit was filed and said criminal proceedings
begun, before said Stobie, justice of the peace as afore-
said, respondent well knew that said chain was thrown
down or unclasped and said premises entered by the
relators without injury to the property of the said Del-
mar Jockey Club and in the manner and only for the
purposes aforesaid; that the acts of the relators con-
stituted no offense under the laws of this State, but
upon the contrary thereof were done in the performance
of their duty as officers and citizens; that said Frank
Stobie as such justice of the peace had no jurisdiction
to entertain or proceed with a criminal prosecution
against relators based upon the facts above stated and
that it was in abuse of his judicial power so to do; that
nevertheless said respondent Stobie assumed jurisdic-
tion of said criminal proceedings against the relators
and although no information was filed with him by the
prosecuting attorney of St. Louis county and notwith-
standing he had no reason to believe relators were likely
to try to escape or to avoid prosecution, the said Stobie,
a justice of the peace, immediately upon the filing of
said affidavit, issued and delivered to respondent Lenz,
as constable, a warrant, commanding him to arrest rela-
tors and each of them and to bring them before him

State ex rel. v. Stobie.

forthwith to answer to the charge contained in said affidavit, and said proceedings are still pending before said Stobie as justice of the peace and respondents are threatening to have relators taken into custody under said warrant, and to force them to a trial before said justice.

"And the relators further give the court to understand and be informed that the only object and purpose of said pretended criminal charge before said justice of the peace against the relators and the sole purpose of the prosecution thereof are to hinder, impede and obstruct the relators in the performance of their duty as policemen, and as officers and citizens of the State and to protect from arrest persons engaged upon said Delmar race track in violating the said act of the General Assembly of the State of Missouri, approved March 21st, 1905, to prohibit book-making and pool-selling and to prescribe a penalty therefor, and hereinbefore mentioned; and to thwart and render of no avail the efforts of the Governor of the State to enforce said law and said proceeding against the relators in an abuse of the judicial power and jurisdiction of said justice of the peace; that it would be a great hardship and expense for all the relators to suffer arrest upon said charge and appear before said justice and contest the case through the courts and that, if said respondents are permitted to continue said prosecution, numerous other similar prosecutions are threatened and will be begun and carried on to the great annoyance, worry and cost of relators, and an unseemly conflict will arise between the subordinate judicial officers and the executive department of the government.

"Your relators therefore show to this honorable court that in proceeding against them under the charge made in said affidavit filed with him by said Mathews as prosecutor the said justice of the peace is acting in excess of his jurisdiction and authority and in grievous abuse of his official power, and in order to protect your

relators against the hardships, injustice and oppression involved in requiring them to defend against said pretended criminal charge predicated upon their acts in enforcing the laws of the State under the directions and by order of the Governor thereof under the circumstances hereinbefore set forth, pray that they may have a writ of prohibition directed to the said Frank Stobie, justice of the peace of St. Louis county, Missouri, and to the respondents Mathews and Lenz, prohibiting them from taking further action in said proceedings against the relators and prohibiting said justice of the peace from taking further cognizance or jurisdiction thereof and that this honorable court in the exercise of its superintending control over the inferior tribunals of the State prohibit said respondents from interfering with or obstructing the relators in the performance of their duties by said criminal proceedings and that relators be granted all such relief as may be appropriate and necessary in the premises, to protect them against said unwarranted and illegal proceedings.''

The facts as stated in the petition were duly verified by one of the relators, and on the 27th of July, 1905, a preliminary rule in prohibition was granted in vacation of the Supreme Court returnable to the Supreme Court of Missouri in Banc on Tuesday, October 10, 1905. Upon the return day of the writ the respondents interposed a demurrer to the petition of the relators. The grounds of the demurrer are thus stated:

''The respondents demur to the petition of the relators, for the reason, that said petition does not state facts sufficient to constitute a cause of action in prohibition in that:

''1.   The police force of the city of St. Louis were not given by the Scheme separating the city and county of St. Louis, the same jurisdiction in the county as in the city.

''2.   The police force of the city of St. Louis are

without jurisdiction in the county of St. Louis, except to enforce a warrant, or warrants for a person, or persons, charged with an offence or offenses committed in the city, a situation which is affirmatively shown to have not existed when the relators invaded the premises of the Delmar Jockey Club.

"3.   The Governor of Missouri has no right or authority to call on the police force of the city of St. Louis to preserve peace and order and to suppress outlawry in the county of St. Louis.

"4.   That even if the Governor had such authority, the assertions of his proclamation to the President of the Board of Police Commissioners set out in the petition, if true, did not constitute or show a state of either lawlessness or outlawry in St. Louis county.

"5.   That there is no law of Missouri which prohibits the registration of bets upon horse races, the act of the General Assembly entitled 'An Act to prohibit book-making and pool-selling, and prescribing a penalty therefor,' approved March 21, 1905, having been enacted in violation of section 28 of article 4 of the Constitution, in that it contains more than one subject, to-wit, book-making and pool-selling, which are not germane, or akin in character.

"6.   That the petition affirmatively shows that the relators were guilty of a trespass upon the property of the Delmar Jockey Club, in that they forced an entrance upon the premises of said jockey club, merely to carry out an order or proclamation issued by the Governor of the State, which was without legal force or effect, which conferred no authority upon any of the relators, and which was merely a bombastic effusion recognizable as a warrant for official action under no rule of conduct known to the law.

"7.   That so far from the respondents and especially the respondents, who are positively a justice of the peace and a constable, being without jurisdiction in the premises, the petition affirmatively shows that each

was clearly within the law, that the justice was not usurping judicial power, and that there is no principle of law to which the writ of prohibition can be made applicable in the premises, or upon the facts.

"8.   That the petition affirmatively shows that the relators were and are possessed of a full and adequate remedy, that the case sought to be made is at best merely one of error which could, or can be corrected on appeal or writ of error, that the relators not being residents of the county, as their petition shows, the justice was required by the statute to immediately issue his warrant upon sworn information being made of the commission by them of a criminal offense, that the respondent, who is constable, was in duty bound to execute the writ issued to him by the justice, and that to prohibit the procedure begun as shown by the petition, is not to prevent an unseemly conflict between subordinate judicial officers and the executive department of the State, but to involve the administration of the laws in utter confusion, to try by the writ matters cognizable only by the officers designated by the laws and determine upon prohibition an issue triable only as provided by the statute, there being no room for confusion except in the imagination of the relators and no conflict except as provided, without warrant of law, by the unprecedented tirade of the Executive.

"Wherefore respondents pray judgment," etc.

Upon October 27, 1905, relators in proper form filed their motion for judgment upon the pleadings and this cause was submitted to the court upon the record as herein indicated and is now before us for consideration.

OPINION.

It is manifest from the record in this cause that we are confronted with but one question, that is, upon the facts stated in the petition of relators, are they entitled

to the relief sought, and is this court warranted in affording such relief by the issuance of its extraordinary writ of prohibition, as prayed for in the petition?

At the very inception of the consideration of the sufficiency of the allegations in the petition as a basis for the issuance of the writ prayed for, it is well to first ascertain the grounds urged by relators upon which this court can safely predicate its action, should their request for the writ be granted. Learned counsel for relators frankly state that the principles upon which the judgment must ultimately rest are few and simple, and concede and say in the brief now before us that "the subordination of the military to the civil power is not involved. The record does not demand a consideration of the circumstances under which the militia may be properly used to suppress riots, insurrections or lawlessness." Nor is it urged, either in the oral argument or brief of counsel, as a basis upon which to predict the issuance of the writ of prohibition prayed for in this cause, that the relators (who were police officers) were in St. Louis county at the place designated in the petition, as a part of the military arm of the State, for the purpose of executing the law, as contemplated by article five, section six, of the Constitution of this State. This eliminates those questions from the discussion of this cause and our attention must be directed to those principles so ably presented by counsel for relators, which must ultimately form the basis of the conclusions reached in this proceeding.

Little is said in the petition as to the nature of the charge before the justice of the peace, against the relators. It is alleged that "on the 24th day of July, 1905, respondent William Mathews filed an affidavit with the respondent Frank Stobie, as justice of Central township, in the county and State aforesaid, charging relators with throwing down and opening the gate at the entrance of said race track, and then and there undertook and attempted to institute, before said Stobie, as

such justice of the peace, a criminal prosecution as for a misdemeanor against the relators and each of them for their action as policemen and officers of the State of Missouri in letting down said chain or unclasping the same in order to enter said enclosure to make the afore-said arrests.'' We do not find a copy of the affidavit of Mathews with the petition, nor has our attention been called to the fact that such copy accompanies the pleadings. It would be much more satisfactory and more in harmony with the usual and ordinary practice in applications of this character, where this court is requested to issue its extraordinary process, prohibiting a judicial tribunal from further acting or proceeding, either in a criminal or civil proceeding, to accompany the petition with a copy of the files and process issued, which furnish the basis of the asumption of jurisdiction. In the absence of a copy of the complaint of William Mathews, filed with the justice of the peace, which was the basis of the action of the justice in issuing his warrant for the arrest of the relators, the complaint of Mathews must be treated as a complaint against the relators in a criminal prosecution under the provisions of the laws of this State, of which complaint the justice had jurisdiction.

The complaint of Mathews being filed, the justice assumed jurisdiction and issued his warrant under the provisions of section 2750, Revised Statutes 1899, in which it is provided: ''That complaints subscribed and sworn to by any person competent to testify against the accused may be filed with any justice of the peace, and if the justice be satisfied that the accused is about to escape, or has no known place of permanent residence or property in the county likely to restrain him for leaving for the offense charged, he shall immediately issue his warrant and have the accused arrested and held until the prosecuting attorney shall have time to file an information.''

It is insisted by relators that the justice of the peace having "no reason to believe that the relators were likely to try to escape or avoid prosecution," there was no lawful authority or jurisdiction to issue a warrant for the arrest of relators based upon such complaint. The petition of the relators shows upon its face that they were members of the metropolitan police force of the city of St. Louis, and therefore presumptively, at least, not residents of St. Louis county, either temporary or permanent. It is not essential to the issuance of a warrant by the justice that he should be satisfied that the accused is about to escape and avoid arrest, but under the second subdivision of the proviso of section 2750, supra, if the relators had no known place of permanent residence or property in the county, this furnished authority equally as satisfactory and clearly as legal as that under the first subdivision, where the justice must be satisfied that the accused was about to escape. The filing of the complaint by Mathews with the justice of the peace gave the justice jurisdiction of the subject-matter. The petition in this cause nowhere alleged that the relators were the owners of property in the county or residents thereof, but expressly avers that they were members of the metropolitan police force of the city of St. Louis, which presumably at least locates their residence in the city of St. Louis, and fully authorizes the justice to issue the warrant. The justice of the peace having obtained jurisdiction of the subject-matter, by the filing of the complaint by Mathews, and reasons provided by the statute, authorizing the issuance of the warrant being disclosed in the petition, renders it unnecessary to express an opinion as to whether or not this court would be warranted in issuing its extraordinary writ (the justice having acquired jurisdiction of the subject-matter) prohibiting the prosecution of a criminal proceeding begun in pursuance of the provisions of section 2750, on the ground alone that the justice had prematurely is-

sued his warrant, without being satisfied that the ac-
cused was about to escape or had no permanent resi-
dence or property in the county. We confess it would
be a novel proceeding to ascertain the fact that the jus-
tice was satisfied or not satisfied with the requisite con-
ditions of the statute, which would authorize him to is-
sue his warrant. Who is to determine when the justice
is satisfied? The statute says, "If the justice be satis-
fied," and if the authority to issue the warrant must
be settled by a court, it might be confronted with the
proposition that the justice would declare that he was
the one under the express provisions of the statute to
be satisfied and the court might say to the justice, you
are not satisfied, and had no authority to issue the war-
rant.

Our attention is directed by counsel for relators
to the case of McCaskey v. Garrett, 91 Mo. App. 354.
It will be observed in that case that the underlying prin-
ciples which authorize this court to issue its writ of pro-
hibition, were not involved and not even discussed. It
was an action for malicious prosecution. The basis of
the action was that the defendant had filed a complaint
with a justice of the peace charging the plaintiff with
a criminal offense; a warrant was issued upon that
complaint and nothing further was done, and the plain-
tiff was discharged. The justice of the peace testified
and stated substantially that he had no reason for issu-
ing the warrant, except that the defendant told him that
the prosecuting attorney desired it issued. It was rul-
ed in that case that under the evidence it was not a case
for malicious prosecution without probable cause; but
rather one of false imprisonment. It was also held, un-
der the evidence as given by the justice, that the war-
rant was illegally issued, and, finally, the court, in con-
clusion, discussing the provisions of section 2750, said:
"This is a wise and mandatory provision of the law,
and in our opinion the necessity arising for the issu-
ing of a warrant for the arrest of a defendant before

the filing of the information by the prosecuting attorney ought to be evidenced either by an entry on the justice's docket, or by indorsement on the writ, or by some other writing equally efficacious.''

It is unnecessary, with the disclosure of the petition in hand, to either express our assent or dissent from the views announced in that case, as to the provisions of section 2750 being mandatory; but we will say, if the court means by what it said that the warrant would be illegal unless the satisfaction to the mind of the justice of the necessity arising for the issuance of the warrant, is ''evidenced either by an entry on the justice's docket or by indorsement on the writ or by some other writing equally efficacious,'' we cannot assent to it. The office of justice of the peace is purely a creation of the statute, and the incumbent of such office is only authorized to perform those duties provided by it and is not required to do anything in respect to the discharge of his .duties as such justice, except such as are provided by law. A justice of the peace is not required to make any entry in his docket evidencing the necessity arising for the issuance of the warrant under the provisions of the section heretofore referred to, nor is he required to indorse such evidence upon the writ or to execute any writing evidencing such fact. It follows logically, if the statute does not require those things to be done, that the doing of them, upon an investigation as to the existence of the necessity provided for the issuing of the warrant, would not constitute evidence of the existence of such necessity.

By this proceeding it is sought to prohibit the justice of the peace and the constable to whom the warrant was addressed by the justice, and the complainant, William Mathews, from further proceeding with the criminal charge inaugurated by complainant and to prevent them from taking any further action in respect to such proceeding.

The insistence of relators is so earnest that the

preliminary rule issued in this cause should be made absolute, and the questions involved are so ably presented by counsel representing them, that it necessitates a brief review of the subject of the writ of prohibition, the office it performs and the principles upon which it may justly be invoked. This subject has frequently been in judgment before this court, and the announcement of the rules and principles applicable to the issuance of this extraordinary writ has been uniform and harmonious from the case of Wilson v. Berkstresser, 45 Mo. 283, down to the recent case of State ex rel. v. Sale, 188 Mo. 493. As the subject now under review deals principally with the question of jurisdiction, it is well to first inquire what is meant by the term jurisdiction. In 17 Am. and Eng. Ency. Law (2 Ed.), 1041, it is said: "Of the various definitions of jurisdiction perhaps the most satisfactory is as follows: Jurisdiction is authority to hear and determine a cause. Since jurisdiction is the power to hear and determine, it does not, as will be pointed out later, depend either upon the regularity of the exercise of that power or upon the rightfulness of the decision made."

In State ex rel. v. Withrow, 108 Mo. 1, the writ of prohibition was denied. GANTT, J., speaking for this court, after fully reviewing the proposition involved in that case, correctly and very tersely thus defined jurisdiction: "It is this very right to hear, determine and decide, whether rightfully or wrongfully, that we denominate jurisdiction." In Wilson v. Berkstresser, supra, it was ruled: "If the court, whose action is complained of, acts within its jurisdiction, but simply commits an error, the writ will not lie. It is not to be confounded with a writ of error or of certiorari, and must not be permitted to take their place." In State ex rel. v. Railroad, 100 Mo. 59, BARCLAY, J., speaking for this court, in discussing the subject of a writ of prohibition, thus stated the law: "Whether the particular facts on which the court proceeds are, or are not, sufficient to

justify its exercise of jurisdiction, is a question of law, the solution of which either way cannot impair the court's right to apply its judicial power in the premises according to its view of the law and of the facts before it. For instance, where a court has jurisdiction to render judgments, in ordinary civil causes, it would be manifestly improper to issue a writ of prohibition against it on an application alleging that it was about to pronounce such a judgment on a petition which did. not state a cause of action, but which the trial court: had held sufficient, or because the latter had ruled erroneously that the plaintiff had a legal capacity to maintain the action. A mistaken exercise of a jurisdiction with which the court is, by law, invested does not furnish a sufficient basis for prohibition. Such mistake may be reviewed as other errors; for example, by appeal, but not by a proceeding like this.'' Citing Mastin v. Sloan, 98 Mo. 252. In State ex rel. v. Scarritt, 128 Mo. 331, it was again announced by this court: ''The writ of prohibition may be invoked to check the use of judicial power when sought to be exerted beyond the lines which the law has marked as the limits for the operation of the power. It may be applied to prevent action by a court in excess of its legitimate authority in a proceeding whose subject-matter falls within the general cognizance of the court, as well as to stay an assumption of power over causes which by their nature are not confided by the law to the court's consideration. But it should not be issued merely to correct some judicial error in ruling on a subject committed to the judgment of the court against which the writ is sought. Still less may it be applied to anticipate a ruling upon a question properly within the authority of the court to decide. The writ cannot rightly be employed to compel a judicial officer, having full jurisdiction over the parties and a cause, to steer his official course by the judgment of some other judge, or to substitute the opinion of another court for his own dealing

with topics committed by the law to his decision.''   Citing In re N. Y., etc., Steamship Co. (1895), 155 U. S. 523.   In that same case the distinction between want of jurisdiction and the mere omission to state a cause of action in the case where jurisdiction exists, was plainly marked, and it was finally ruled that the remedy of prohibition cannot be called into play where the court has jurisdiction, merely on the ground that the complaint or petition is defective, even in some substantial particular.

In State ex rel. v. Elkin, 130 Mo. 90, this court, in defining the· purpose and office of the writ of prohibition, announced the rule thus: ''The writ of prohibition is applicable whenever judicial functions are assumed which do not rightfully belong to the person or court assuming to exercise those functions.  .  .  .  . The writ is as available to keep a court within the limits of its power in a particular proceeding as it is to prevent the exercise of jurisdiction over a cause not given by the law to its consideration.''   And in that same case it was clearly pointed out that the cases which the writ of prohibition was specially designed to reach were those in which the court assumed authority to pass judgment upon a subject not committed by law to the decision of the tribunal so assuming to act.

In Railroad v. Wear, 135 Mo. l. c. 256, the court, in announcing the rule applicable to the subject now in hand, used this language: ''Where a court or judge assumes to exercise a judicial power not granted by law, it matters not (so far as concerns the right to a prohibition) whether the exhibition of power occurs in a case which the court is not authorized to entertain at all, or is merely an excessive or unauthorized application of judicial force in a cause otherwise properly cognizable by the court or judge in question.  [State ex rel. v. Walls (1892), 113 Mo. 42 (20 S. W. 883);   In re Holmes (1894), 1 Q. B. (1895) 174.]   Prohibition, however, will not ordinarily be granted where the usual

modes of review by appeal or writ of error furnish an adequate and efficient remedy for the correction of an injury resulting from the unauthorized exercise of judicial power.'' In State ex rel. v. Zachritz, 166 Mo. 307, this court was asked to interpose its writ of prohibition. The proceeding sought to be prohibited was one instituted by the Attorney-General in the nature of an equitable action to cancel certain licenses issued to relators, and in the meantime restrain them from operating their business under such licenses. The writ was denied, and one of the principal questions involved was as to the right of the Attorney-General to maintain the action. BRACE, J., speaking for this court, after reviewing all the authorities pertinent to the propositions involved, said: ''Moreover, whether the State can maintain the action is a question to be raised and determined in the court where the case is pending; it does not go to the power or jurisdiction of the court, and its decision here could not furnish a basis for prohibition.'' In support of this clear and terse announcement of the law as applicable to that case, nearly all of the cases heretofore referred to, announcing the rules in respect to the issuance of writs of prohibition, were cited approvingly.

The law upon this subject is nowhere better or more clearly stated than in the case of Schubach v. McDonald, 179 Mo. 163. MARSHALL, J., in discussing the question of jurisdiction involved in that proceeding, after an exhaustive review of the subject before him, thus announced his conclusion upon the subject of jurisdiction. He said: ''The matter, therefore, compresses itself into the question whether or not a basic subject-matter, over which a court of equity has jurisdiction, was presented to the circuit court for adjudication by the injunction suits. That is, whether a matter was presented which that court has power to deal with, and not whether such a matter was inartificially or defectively presented. In other words, the question is one of juris-

diction and not of pleading, for if the court had jurisdiction over the subject-matter, it had the power to decide whether the pleadings were or were not properly drawn, and also to decide whether or not the plaintiff was entitled to the relief sought. If a court has the power to act, its jurisdiction is in no wise impaired by the consideration whether it acted in accordance with the law or erroneously. Given the jurisdiction, all else is a mere matter of error, to be corrected on appeal. Or, further illustrated, if the court has jurisdiction over the subject-matter, it has the power to decide whether the petition does or does not state a cause of action, and the mere failure of a petition to state a cause of action or the defective statement of a good cause of action, in no way affects the jurisdiction of the court.'' [Citing State ex rel. v. Scarritt, 128 Mo. l. c. 339-340.]

Counsel for relators particularly direct our attention to the recent cases of State ex rel. v. Sale, 188 Mo. 493, and State ex rel. v. Eby, 170 Mo. 497. These cases in no way conflict with those heretofore cited, nor do they announce any different rule as applicable to this subject, but on the other hand they follow the unbroken line of expression by this court repeatedly and uniformly announcing the law upon this subject. In the Sale case the proceeding sought to be prohibited was one to disbar an attorney at law of the city of St. Louis. As was said by the court in that case, the petition in that disbarment proceeding was not addressed to the general jurisdiction over attorneys at law practicing at the bar, but was founded on a particular statute without which the court has no authority to take the particular action therein prescribed within which alone it can not render the particular judgment therein directed, hence it was held that, while the court had general jurisdiction over attorneys at law practicing at its bar, yet this being a proceeding under a particular statute in pursuance of which it could only render a particular

judgment and finding from the disclosures in the peti-
tion, the court had no authority to render that particu-
lar judgment, and the extraordinary writ of prohibition
was properly awarded. VALLIANT, J., in speaking for
the court upon the question of jurisdiction, correctly
and clearly announces the principles applicable to the
extraordinary writ of prohibition. He said: "The
fact that it would be error for the court to render a cer-
tain judgment which the relator fears it is about to
render is not in itself a sufficient reason for the issuance
of such a writ. The presumption is that the court will
not render a wrong judgment in a case of which it has
jurisdiction, and that it will not render any judgment at
all except a judgment of dismissal in a case of which it
has no jurisdiction. Ordinarily, therefore, even when
the petition in the circuit court states no case within its
jurisdiction, until the court takes some action indicating
a purpose to entertain jurisdiction, a writ of prohibition
will not issue, because the assumption must be indulg-
ed that when the case comes up for action the circuit
court will dispose of it on the ground that it has no jur-
isdiction. And it is not every case in which the court
erroneously decides that it has jurisdiction that calls
for a writ of prohibition. The writ of prohibition, in
spite of the frequent use to which it has in late years
been put, is still an extraordinary writ and issues only
when sound judicial discretion commends it; in that
view it is not a writ of right. On the other hand, whilst
the main office of the writ is to keep the court to which
it is addressed within the bounds of its jurisdiction, yet,
in the exercise of the discretion above referred to, the
writ is sometimes used to keep a court from doing what
it has no lawful authority to do in a case the general
nature of which is within its jurisdiction." The same
may be said of the Eby case. In that case the prosecut-
ing attorney filed twelve hundred and three informa-
tions against the relator charging violation of the act
approved May 14, 1899, creating the office of Inspector

of Beer and Malt Liquors of the State and providing
for the inspection of beer and malt manufactured and
sold in this State.  Subsequent to a decision by this
court holding said beer inspection act valid, there was
an act of the General Assembly, approved on April 15,
1901, authorizing the compromise and settlement of all
demands for inspection fees for the State, arising prior
to March 19, 1901, under the act approved May 14, 1899.
SHERWOOD, J., speaking for the court upon the ques-
tions presented in that case, said: "The 'Beer Com-
promise Act', being an act of general amnesty, enacted
by the Legislature in favor of the class to which relators
belong, there was no manner of necessity for relators
to plead it in bar of the prosecution in the lower court,
since they could not have waived it if they would.  And
that act being a public law, the respondent judge was
bound to take notice of it, and could not ignore it if
he would.  And yet, notwithstanding the contract made
by relators with the State in pursuance of an express
law enacted for the purpose; notwithstanding a solemn
contract made, a consideration paid and accepted, and
legislative amnesty granted, the respondent judge
places himself on this record as intending to try rela-
tors on the very charges which the act, on compliance
with its terms, says shall be barred.  We do not hes-
itate to say that such intended course of conduct is in-
dubitably beyond the jurisdiction of the trial court, and
such fact is made apparent on the face of this proceed-
ing."

It is clear that the conclusions announced in the
Eby case in no way invade the underlying principles
applicable to the issuance of the writ of prohibition
as has been so clearly and uniformly announced by this
court in the cases herein cited.  From these cases may
be deduced the following principles and rules applica-
ble to the issuance of writs of prohibition:

1.  To authorize a party litigant to invoke the aid
of a writ of prohibition it must appear, in the

proceeding sought to be prohibited, either that the court or judge in such proceeding was assuming to exercise and apply judicial power not granted by law or in a proceeding properly within its jurisdiction the court assumes to apply judicial force in excess of its power and authority so to do.

2.    That if the court has jurisdiction of the class of cases to which the proceeding sought to be prohibited belongs, and acquires jurisdiction of the subject-matter, the mere fact of defects in the petition or complaint by which the proceeding was inaugurated, will not authorize the issuance of a writ of prohibition.

3.    That the courts will not permit writs of prohibition to usurp the place of appeals, writs of error or *certiorari.*

It is clear, applying these principles to this proceeding, that unless the remaining grounds urged by relators authorize it, they are not entitled to invoke the aid of this extraordinary writ.

This leads us to the consideration of the remaining propositions involved in this proceeding.    The vital questions upon which the insistence of relators are predicated, that the preliminary rule in this cause should be made absolute, may thus be briefly stated:

1st.    That the relators were members of the metropolitan police force of the city of St. Louis, and as such at the time the unlawful acts are alleged to have been committed by them, they had the same power in the county of St. Louis as they were authorized to exercise in the city, and therefore vested with authority to make arrests for the commission of criminal offenses in the said county of St. Louis and that the acts charged to have been done were in pursuance of the discharge of their duties as police officers and within their proper jurisdiction; hence, they were violating no law and the preliminary rule should be made absolute upon this ground.

2nd.    If they were not authorized to make the ar-

rests in St. Louis county, and do the acts with which they were charged in the complaint, in the proceeding before the justice of the peace, as police officers, then they were authorized under the facts disclosed by the petition to do such acts as private citizens.

3rd. That the allegations in the petition are admitted by the interposition of the demurrer filed in this cause, and that it being alleged in the petition that "the only object and purpose of said pretended criminal charge before said justice of the peace against the relators and the sole purpose of the prosecution thereof, are to hinder, impede and postpone relators in the performance of their duties as policemen and as officers and citizens of the State and to protect from arrest persons engaged on said Delmar race track in violating the said act of the General Assembly of the State of Missouri, approved March 21, 1905," is sufficient to warrant this court in issuing its extraordinary writ.

Upon the first proposition relators contend that under the proviso of section 14 of the Scheme and Charter adopted in pursuance of the Constitution of 1875, section 20, article 9, the metropolitan police of the city of St. Louis were vested with the same power and authority in the county of St. Louis as they were in the city, and that this power so vested is now in force under the laws of this State. After a careful consideration of this proposition we are unable to give our assent to this contention. Section 14 of the Scheme and Charter above referred to, after stating that the costs of maintaining the metropolitan police shall be paid by the city of St. Louis, contains this proviso: "Provided, however, that the metropolitan police of the city of St. Louis shall have the same power and jurisdiction in the county of St. Louis, as constituted by this Scheme, as now provided by law: Provided, that upon a petition of the county court of St. Louis county, the board of police commissioners shall appoint and equip not more than twenty policemen, as provided in the act approved

March 13, 1867, for duty in said county.    The cost of equipping and maintaining said police shall be paid by the county as herein established.'' It is manifest that section 20, article 9, of the Constitution of 1875, as applicable to the subject of the Scheme and Charter of the city of St. Louis and St. Louis county, simply contemplated the vesting of power in the people to elect the freeholders to propose a scheme for the enlargement and definition of the boundaries of the city, the reorganization of the government of the county, the adjustment of the relations between the city thus enlarged and residue of St. Louis county.    In other words, the separation of the government of St. Louis city and county and making them distinct and separate municipalities. The powers of the freeholders elected in pursuance of the provisions of the Constitution were simply to perform the duties and propose a scheme in harmony with the Constitution and laws of this State, accomplishing the work as contemplated by the Constitution which vested them with such power.    It is clear that numerous sections of the Scheme and Charter proposed by the freeholders, contemplated by the Constitution, which were in harmony with the Constitution and laws of this State, were operative and valid and remained so as long as they were not in conflict with any of the general laws or the Constitution of this State. On the other hand, it is equally clear that if subsequent to the adoption of such Scheme and Charter there should arise a conflict between its provisions and any general law subsequently enacted by the General Assembly or the Constitution of the State, the provisions of the Scheme and Charter so in conflict would become inoperative and of no force or validity.    In other words, if there is a conflict between the Scheme and Charter and the general law or the Constitution, the provisions of the Scheme and Charter must give way to the provisions of the law and Constitution of this State.

The metropolitan police system now in force, ap-

plicable to the city of St. Louis, is a creature of the
statute. By an act of the General Assembly approved
March 27, 1861, the present system was inaugurated.
This act created a board of police commissioners and
expressly defined their powers. This act was amended
by the General Assembly at its session in 1867, by an
act approved March 13, 1867. The General Assembly
in 1899, by an act approved March 15, 1899, while con-
tinuing in force many of the provisions of the act of
1861 and acts supplementary thereto, substitutes an
entirely new act and provides by the first section,
"That an act entitled 'An act creating a board of police
commissioners and authorizing the appointment of a
police force for the city of St. Louis,' approved March
27th, 1861, and all acts supplementary to and amenda-
tory thereof be and the same are hereby repealed." This
act expressly defines the duties and powers of the
board of police commissioners created by it. The valid-
ity of this act was assailed in State ex rel. v. Mason, 153
Mo. 23. Responding to that assault made upon this act,
this court, speaking through GANTT, J., said: "The
fundamental principle underlying the acts of 1861 and
1899, creating boards of police commissioners for the
city of St. Louis, are the same, and the constitutionality
of such legislation has stood the test of the most critical
judicial examination and review. Laws like these and
those of other States providing a metropolitan police
system for large cities, are based upon the elementary
proposition that the protection of life, liberty and prop-
erty and the preservation of the public peace and order
in every part, division and sub-division of the State,
is a govermental duty which devolves upon the State
and not upon its municipalities any farther than the
State in its sovereignty may see fit to impose upon or
delegate it to the municipalities." As was said in that
case, the duty of providing a metropolitan police sys-
tem for large cities for the protection of life, liberty
and property and the preservation of the public peace

and order in every part, division and sub-division of the State, is imposed upon the State and not upon its municipalities any farther than the State in its sovereignty may see fit to impose upon or delegate it to the municipalities; hence to ascertain the duties and powers of the officers created under this police system, applicable to the city of St. Louis, created by the State through its General Assembly, we must look to the original source of such system where the powers and duties of those who are commanded by the law to put it in operation, are expressly defined.

The police system of the city of St. Louis being a subject of State legislation, and the General Assembly having created such system, as well as the officers connected with it, and having expressly defined the powers and duties of the officers, it was not within the power of the framers of the Scheme and Charter, contemplated by the Constitution, to vest such officers with powers inconsistent with and not in harmony with the general laws of the State creating such police system. The provisions of section 5, Laws 1861, page 448, so far as they are applicable to the proposition now in hand, provides that: "The duties of the board of police hereby created shall be as follows: They shall at all times of the day and night within the boundaries of the city of St. Louis, as well on water as on land, preserve the public peace, prevent crime, and arrest offenders. . . . . . In case they shall have reason to believe that any person within said city intends to commit any breach of the peace, or violation of law or order beyond the city limits, any person charged with the commission of crime in the city of St. Louis, and against whom criminal process shall have issued, may be arrested upon the same in any part of this State by the police force created or authorized by this act." It is apparent that these provisions limit the duty to arrest offenders as well as the power to do so. In the first instance they are limited in arresting offenders to the boundaries of

the city of St. Louis. Secondly, it is pointed out under what circumstances they may arrest persons within the city, where there is reason to believe that such persons found within the city intend to commit any breach of the peace or violation of law or order, beyond the city limits. Thirdly, where the offense is committed in the city of St. Louis and criminal process has issued against such offender, the arrest may be made upon such process by the police force of such city in any part of the State. Under the provisions of the Scheme and Charter proposed by the thirteen freeholders, by section two, it is provided: "The city of St. Louis, as described in the preceding section, and the residue of St. Louis county, as said county is now constituted by law, are hereby declared to be distinct and separate municipalities." Confronted with these provisions it will certainly not be seriously urged that under the provisions of the act of 1861 the police officers of the city of St. Louis were authorized to make arrests in St. Louis county, for offenses committed in that county or to perform any other duty in their official capacity in said county, not expressly authorized by the act which created the offices and expressly defined the duties of the incumbents thereof. The express provision in the act defining the duties of the officers must be treated as excluding any authority to perform other functions not embraced in the act. In substance the statute expressly providing the duties to be performed by the officers under the law inaugurating the police system in the city of St. Louis, was a command of the law-making power to the officers, "This law created the offices you are filling, and you must confine yourselves to the performance of the duties expressly designated by it." We can conceive of no case where the familiar maxim, "*expressio unius, exclusio alterius*," can be more appropriately applied.

The act of 1861 was amended by an act of March 13, 1867, and section 3 of that amendatory act, in refer-

ence to the board of police commissioners of the city of St. Louis, provides that "the board, whenever and for so long a time as may be necessary, is further authorized to appoint, mount and equip not more than twenty policemen for duty in the outskirts and open portions of the city and elsewhere in the city and county of St. Louis." The act of 1861 and the amendatory act of 1867, were in force at the date of the adoption of the Scheme and Charter by which the county of St. Louis and the city of St. Louis were separated and declared to be separate and independent municipalities. The provisions of section 14 of said Scheme and Charter, which learned counsel for relators insist is still in force, was simply an effort on the part of the framers of the Scheme and Charter to harmonize the provisions of the Scheme and Charter with the existing provisions of the law. This is clearly indicated by the terms employed in the section where it is provided "that the metropolitan police of the city of St. Louis shall have the same power and jurisdiction in the county of St. Louis as constituted by this Scheme, *as now provided by law.*" Then follows the provision referring to section three of the amendatory act of 1867. It is apparent from the very terms of section 14 that the framers of the Scheme and Charter realized that they had nothing to do with the creation of the metropolitan police system of the city of St. Louis, and that the duties and powers of the officers, provided for by the law creating the system, having been expressly defined by an act of the General Assembly, they were without authority to prescribe the duties and powers of such officers, unless such authority had some existing law upon which to predicate it. It was never contemplated by section 14 of the Scheme and Charter that the provisions of said section applicable to the provisions of the officers of the St. Louis police, should continue in force regardless of the fact that the law which conferred such powers should be repealed, leaving no basis upon which the provisions of

said section could stand. The lawmaking power of the State created this system of police for the city of St. Louis, and having defined the duties and the powers of the officers of such system, the right to perform other duties and exercise additional power outside of the limits of the territory for which the system was created, must be predicated, not upon a mere provision of a Scheme and Charter of a municipality, but upon expressions from the source from which the metropolitan police system was brought into existence. The correctness of this conclusion is emphasized and the intention of the Legislature clearly indicated by the emphatic terms employed in section 1 of the original act of 1861 in which it is stated that "no ordinance heretofore passed, or that may hereafter be passed by the common council of St. Louis shall in any manner conflict or interfere with the powers or the exercise of the powers of the board of police commissioners of the city of St. Louis, as hereinafter created, nor shall the said city or any officer or agent of the corporation of said city or the mayor thereof in any manner impede, obstruct, hinder, or interfere with the said board of police or any officer, or agent, or servant thereof or thereunder."

The act of 1861, as well as the amendatory act of 1867, and all other supplementary acts, were repealed by the act of 1899, heretofore referred to; this left the provisions of section 14 of the Scheme and Charter, so far as it was applicable to the exercise of jurisdiction by the officers of the metropolitan police of the city, without any foundation upon which to stand, unless it can be found in some of the provisions of the act of 1899. Section 5 of the act of 1899 is substantially a re-enactment of section 5 of the original act of 1861—embracing the same limitations and exceptions to such limitations, as are contained in the act of 1861. The purpose and intent of the Legislature, in the act of 1899, is most clearly disclosed in the provisions of section 18, Laws 1899, page 59. It provides: "The boards,

whenever and for so long a time as may be necessary,. is [are] authorized, out of the force hereinbefore provided for, to appoint, mount and equip as many policemen as they may deem necessary for duty in the parks,. outskirts and such other portions of the said cities as. the board may deem necessary.'' It will be observed that this section covers substantially the same subject as was embraced in the provisions of section 3 of the amendatory act of 1867, herein quoted, and which was referred to in section 14 of the Scheme and Charter, heretofore indicated—except it fails and omits to embrace any part of the county of St. Louis as was done in the act of 1867. The difference in those sections, though slight, becomes significant and will be readily noted. Section 3 of the act of 1867 provides that the board should appoint and equip a certain number of policemen for duty in the outskirts and open portions of the city, and elsewhere in the city and *county of St. Louis*. Section 18 of the act of 1899 also provides for the appointment of policemen for duty in the parks and outskirts, but limits and confines the performance of such duty within the limits of the cities embraced in the act.

We have carefully considered each and every section of the law of 1899, enacted by the General Assembly of this State, creating the metropolitan police system of the city of St. Louis, and we are unable to find any provision upon which the relators can predicate their authority for undertaking to exercise jurisdiction in the county of St. Louis. But on the other hand the provisions of the act of 1899 clearly indicate the purpose and intention of the Legislature to divest the officers of the police system of the city of St. Louis of all authority to exercise jurisdiction in the county of St. Louis; that is, all authority in respect to arresting offenders in the county for the commission of offenses committed in said county.

Counsel for relators, in support of their insistence

that the provisions of section 14 of the Scheme and Charter are continued in force, invoke the familiar rule that repeals by implication are not favored in the law. This rule, technically speaking, applies only to enactments of laws by the same legislative body, and it is extremely unusual for the General Assembly of the State to expressly repeal a charter provision of a municipality. The law-making power of the State covers a broader field and proceeds to enact such general laws upon subjects about which it has the right to legislate, and the municipalities must take notice of such legislation and whenever their charter provisions conflict with such general laws, it is not essential that the Legislature should repeal such charter provisions or in any way give expression to its disapproval of them; but it is simply the plain duty of the municipalities to see that their charter provisions are in harmony with the Constitution and laws of this State, otherwise they are inoperative and of no force or vitality.

It may be said that these two local governments, situated as they are, created the necessity for a law extending the jurisdiction of the police system of the city of St. Louis to the county of St. Louis. This by no means can warrant or furnish a justification to this court, in order to meet a condition complained of, to treat a law as existing, when in fact none exists.

While the metropolitan police system was created by the State through its General Assembly, it was created for the city. The city and county of St. Louis, by the express provisions of the Scheme and Charter, were made separate, distinct and independent municipalities, and unless we are to absolutely ignore all the principles of local self-government, which has ever been the pride of this great Commonwealth, it must be held under the law now in force, that as police officers, relators were without authority to arrest offenders in St. Louis county for offenses committed in such county.

Upon the second proposition, that relators were at

the place in St. Louis county where the unlawful acts are charged to have been committed, as citizens, and as such had the right to do what was done, and therefore are not guilty of any violation of the law, it is sufficient to say that these are matters of defense upon the trial of the charge preferred, and this court, upon this application for a writ of prohibition, is not warranted in determining the guilt or innocence of the relators, and the allegations of that nature furnish no basis for the issuance of the writ.

This brings us to the consideration of the only remaining proposition involved in the record before us. This proposition is embraced in the contention of relators that the allegation in the petition, which is admitted by the demurrer, that "the only object and purpose of said pretended criminal charge before said justice of the peace against the relators and the sole purpose of the prosecution thereof are to hinder, impede and obstruct the relators in the performance of their duty as policemen, and as officers and citizens of the State and to protect from arrest persons engaged upon said Delmar race track in violating the said act of the General Assembly of the State of Missouri, approved March 21st, 1905," fully warrants this court in issuing its extraordinary writ of prohibition. We are unable to give our assent to this contention of relators. It will be observed that this allegation in the petition upon which relators base this contention is, "that the only object and purpose of said pretended criminal charge and the sole purpose of the prosecution thereof, are to hinder, impede, obstruct," etc., followed by the allegations heretofore referred to. We are unable to conceive what the object and purpose of a prosecution has to do with the jurisdiction acquired by the justice. It is immaterial, so far as conferring jurisdiction upon the justice, what the objects and purposes of the prosecution were. William Mathews was the complainant in said cause before the justice and filed the charge

against the relators and must be treated, so far as the disclosure of the petition are concerned, as the prosecuting witness; hence the allegations upon which this contention is predicated are directed solely to respondent Mathews. He made the charge and the petition avers the improper object and purpose in making it. The said allegations apply to the prosecution of the charge, and Mathews is the complainant and prosecuting witness; hence those allegations are exclusively directed to Mathews. There is an entire absence of any charge in the petition that the justice of the peace acquired and assumed jurisdiction of said cause for the objects and purposes attributed to Mathews in making the charge, and in his prosecution of it, or that the justice had any knowledge of such objects and purposes. The objects and purposes of Mathews or any one else in making a charge and prosecuting it against relators for the commission of a misdemeanor, absolutely have nothing to do with the jurisdiction acquired by the justice, and can in no way affect such jurisdiction. Even though the justice entertained the purposes attributed to Mathews, while it would be reprehensible in him as an officer, and would furnish a sufficient reason to the relators to invoke the aid of the provisions of the statute providing for changes of venue, it does not go to the jurisdiction of the justice and furnish a basis for the issuance of the writ of prohibition.

If we are to announce the rule that the objects and improper purposes of complaining witnesses in the courts of this State, and the judges of such courts, are to be considered as affecting the jurisdiction of the tribunals in which complainants are lodged and made the basis of issuing the extraordinary writ of prohibition, then we confess that prosecution in criminal as well as civil cases will be subjected to many delays (at least until a hearing can be had upon the preliminary rule) by applications for writ of that character, based upon allegations of such objects and purposes of the trial

court, and the administration of justice unnecessarily retarded.

We see no reason for granting the relief sought by relators in this proceeding. The fact that they may be entirely innocent of any infraction of the law can furnish no legal reason for the issuance of this writ, nor does the fact that it greatly inconveniences them to make their defense through the courts, do so. True judicial history affords ample proof of many innocent, upright and worthy citizens being arraigned before the courts of this country, charged with much higher grades of crime than are relators; yet the courts had jurisdiction of such charges and proceeded in the usual and ordinary way provided by law to try and determine such charges, and ultimately, sometimes in the trial court, at other times in the courts of last resort, their innocence is made to appear and they go acquitted; yet we are without precedent for any court under our system of procedure, to issue its extraordinary writ prohibiting such formal trial of persons, even though they be innocent of the grave charges perferred against them.

The law announced by the courts is not merely for a day, and new principles should never be created or doubtful ones declared to meet the seeming demands and conditions surrounding any particular case. While there may be instances in which the law is inadequate to promptly meet and punish every wrong committed, this however does not authorize the courts to remedy such defects by judicial legislation, and at last, the safety of the people, as well as the protection of their lives, liberty and property, must depend upon the full recognition by the courts of the country of the fundamental principles of government, as well as of law, and a strict adherence to such principles, and the fearless application of them in the administration of justice.

While it may be said that relators are police officers and should be granted the relief sought by this

proceeding, yet it must be remembered that this court, in issuing its extraordinary writ, must be able to point to some of the principles herein indicated, applicable to writs of that character, as a basis for its action. Under our system of government it has ever been the boast of American jurisprudence that "no man is above the law," and we know of no garb that will exempt the individual from obedience to its provisions.

We have thus indicated our views upon the propositions presented in the record, which results in the conclusion that the demurrer presented by respondents, to the petition of relators, should be sustained and it is so ordered. *Brace, C. J., Gantt, Burgess* and *Lamm, JJ.,* concur; *Marshall* and *Valliant, JJ.,* dissent.

DISSENTING OPINION.

MARSHALL, J.—This is an original proceeding in prohibition. The nineteen relators are members of the metropolitan police force of the city of St. Louis. The respondent Stobie is a justice of the peace of Central township, St. Louis county, and the respondent Fred Lenz is the constable of said township. The respondent Mathews is a private citizen, and so far as is disclosed by the record, has no more interest in the matters undergoing adjudication than any other citizen possesses.

On the 28th of July, 1905, the petition was presented to the writer hereof and a preliminary rule in prohibition awarded. Upon the return day of the rule the defendants demurred to the petition. The case was then fully argued before this court, In Banc, and the matter is now ripe for adjudication, upon the petition and demurrer thereto.

The material allegations of the petition are as follows:

First, that the relators, at the time stated, were

194 Sup—5

citizens of the State of Missouri, residents of the city
of St. Louis, members of the metropolitan police force
of that city, and that the respondent Stobie was, and is,
justice of the peace of Central township in St. Louis
county, and the respondent Lenz, the constable of said
township. The petition nowhere disclosed that William Mathews, the other respondent, has any interest
in the matter other than as a citizen, nor does it anywhere appear that he has been personally aggrieved in
any manner whatever.

Second, that Hon. Joseph W. Folk, Governor of the
State of Missouri, by virtue of the authority vested in
him by the Constitution and laws of Missouri, on the
21st day of July, 1905, issued and delivered to Hon. A.
C. Stewart, president of the Board of Police Commissioners of the city of St. Louis, the following communication:

"Office of the Governor.
State of Missouri.
City of Jefferson.

"July 21st, 1905.

"Hon A. C. Stewart,
President Board of Police Commissioners,
St. Louis, Mo.

"Dear Sir:

"Information having come to me that a state of
lawlessness exists in St. Louis county; that men backed
by millions of wealth and political influence are openly
committing felonies by registering bets on horse races;
that dramshop-keepers in flagrant defiance of the statutes keep their places open on Sunday; that men are
openly held up and robbed in the orgies and the general
debauchery following the violations of this law; that
gamblers ply their trade uninterrupted and scoff at the
authority of the State; that the laws of the State are
nullified and the statutes of the State trampled in the
dust, and the honor of the State assailed without inter-

ference or hindrance, and that the local officials either cannot or will not uphold the laws there:

"Whereas, such conditions cannot be tolerated in Missouri; and

"Whereas, it is the sworn duty of the executive to execute the laws of the State; and,

"Whereas, the metropolitan police force of the city of St. Louis is by the Scheme separating the city and county, which was voted upon by the people of the whole county in accordance with the Constitution, given the same jurisdiction in the county as in the city; and,

"Whereas, the Governor as the supreme conservator of the peace throughout the State has the right to call on the metropolitan police force as a part of the military arm of the State, to preserve peace and order and suppress outlawry:

"Now, therefore, in order to maintain the peace and dignity of the State and to preserve the majesty of the laws of the State, you are hereby directed to instruct the chief of police of the city of St. Louis to detail fifty officers or more for duty in St. Louis county with orders to proceed, with all convenient speed, to Delmar race track in said county of St. Louis, and there arrest any and all persons feloniously registering bets, and to seize and hold as evidence all money, papers and paraphernalia connected with said felonies. When so arrested the felons will be taken by the officers before some justice of the peace of the county and warrants sworn out for them, with the officers as witnesses, in the usual way. The arrests must continue from day to day as long as the felonies are committed. The officers should be further instructed to see that the dramshop laws, and the gambling laws are observed and to close all dramshops found to be open contrary to the statute in such cases made and provided, and to arrest all persons found to be violating such laws. These outlaws, when so arrested, will be turned over to the sheriff, and warrants sworn out for them before a justice of the

peace, in manner and form as above set out.   Every arrest should be by the officer who himself sees the crime committed, and by no other.

"Very respectfully,
"Joseph W. Folk, Governor."

Third, that thereupon President Stewart issued the following order to Hon. Mathew Keily, chief of police of the City of St. Louis, under whose orders the relators were acting in all of the matters set forth in the petition, to-wit:

"July 23rd, 1905.

"Hon. Mathew Keily,
      Chief of Police,
            Four Courts, City.

"Sir:

"I herewith hand you a letter from the Governor of the State of Missouri concerning a state of lawlessness said to be existing in St. Louis county and requiring the aid of the police officers to suppress the same. Please give careful attention to the contents of the Governor's letter and comply therewith as promptly as possible.

"A. C. Stewart,
"President Board Police."

Fourth, that thereupon said Keily, as said chief of police, ordered the relator McNamee, as captain of said police force, to take with him the other relator herein, and proceed to the Delmar race track, and there to carry out the orders contained in the communication from the Governor, aforesaid.

Fifth, that the Delmar Jockey Club is a corporation, organized under the laws of the State of Missouri, and at all the times herein mentioned was, and still is, the owner of the Delmar race track; that said race track is partly in the city of St. Louis, and partly in the county of St. Louis; that the articles of association of said Delmar Jockey Club disclose one

of the purposes of the Club to be, "to own race tracks and grounds and to engage in pool-selling, book-making and registering bets on the exhibition of speed and on races at said tracks and premises and to let the right to others to do the same; that on the 16th day of June, 1905, the said Delmar Jockey Club was permitting and suffering pools to be sold, and bets to be registered upon races to be run thereon, and has ever since continued so to do in direct violation of the act of the General Assembly of this State, entitled, 'An Act prohibiting book-making, and pool-selling and prescribing a penalty therefor,' approved March 21st, 1905; that said book-making, pool-selling and registering bets were done on that part of said race track located in St. Louis county, but that the race track and the enclosure thereof extended into the city of St. Louis; that many persons were in the habit of going from the city of St. Louis to the said Delmar race track for the purpose of, and were there engaged in, book-making and selling pools and registering bets upon the races being run upon said track, and were thereby committing felonies under the statutes of this State; that these facts were known to the relator, George T. McNamee, and the other relators herein;" that on, to-wit, the 24th day of July, 1905, "relators were informed and had good reason to believe, and did believe, that divers persons were engaged on that part of said Delmar race track located in the county of St. Louis, in book-making, and in recording and registering bets, and in selling pools within the enclosure, booths and buildings of said Delmar Jockey Club, said bets being registered and pools sold upon the results of the trial of speed and power of endurance of beasts, which was to take place upon the said Delmar race track, and the selling of said pools and registering of said bets then and there being carried on constituted a felony under the laws of this State; that said registering of bets and pool-selling were in the presence of some of

the relators therein, and the said George T. McNamee, the captain in charge of the police force in the said race track, was informed thereof and was notified that persons within said enclosure were then in the act of violating the criminal laws of the State and that felonies were being committed within said enclosure; that thereupon he demanded admission into said enclosure for himself and the other relators herein, as officers and citizens of the State of Missouri, for the sole and only purpose of arresting and taking before the proper magistrate, to be disposed of according to law, such persons as might be engaged in the commission of said felonies therein; and that upon such permission being denied, the relators, acting by and under the orders of the Governor of Missouri hereinbefore set out, let down or unclasped the chain across the entrance of said race track in the county of St. Louis and State aforesaid, and went into said enclosure, without injuring said property, and for the sole purpose of arresting the persons engaged therein in violating the criminal laws of the State, as they were ordered and directed to do by the chief executive of the said State; that thereafter, to-wit, on the 21st day of July, 1905, respondent William Mathews filed an affidavit with the respondent Frank Stobie, as justice of the peace of Central township in the county and State aforesaid, charging relators with throwing down and opening the gate at the entrance of said race track and then and there undertook to attempt to institute, before said Stobie, as such justice of the peace, a criminal prosecution, as for a misdemeanor, against the relators, and each of them, for their action as policemen and officers of the State of Missouri, in letting down such chain or unclasping the same in order to enter said enclosure to make the aforesaid arrest; that at the time said affidavit was filed and said criminal proceedings begun before said Stobie, justice of the peace as aforesaid, respondents well knew that said chain was thrown down or unclasped and said

premises entered by the relators without injury to the property of said Delmar Jockey Club, and in the manner and only for the purposes aforesaid; that the action of the relators constituted no offense under the laws of the State, but upon the contrary thereof was done in the performance of their duties as officers and citizens; that said Frank Stobie, as such justice of the peace, had no jurisdiction to entertain or proceed with a criminal prosecution against relators based upon the facts above stated, and that it was an abuse of his judicial power so to do; that nevertheless the said respondent Stobie assumed jurisdiction of said criminal proceeding against the relators, and although no information was filed with him by the prosecuting attorney of St. Louis county and notwithstanding he had no reason to believe relators were likely to try to escape or avoid prosecution, the said Stobie, a justice of the peace, immediately upon the filing of said affidavit, issued and delivered to respondent Lenz, as constable, a warrant commanding him to arrest relators and each of them, and to bring them before him forthwith to answer to the charge contained in said affidavit, and said proceedings are still pending before said Stobie, as justice of the peace, and respondents are threatening to have relators taken into custody under said warrant, and to force them to a trial before said justice.

"And the relators further give the court to understand and be informed that the only object and purpose of said pretended criminal charge before said justice of the peace against the relators, and the sole purpose of the prosecution thereof are to hinder, impede and obstruct the relators in the performance of their duty as policemen and as officers and citizens of the State and to protect from arrest persons engaged upon said Delmar race track in violating the said act of the General Assembly of the State of Missouri, approved March 21st, 1905, to prohibit book-making and pool-selling and to prescribe a penalty therefor, and hereinbe-

fore mentioned, and to thwart and render of no avail the efforts of the Governor of the State to enforce said law, and said proceedings against said relators is an abuse of the judicial power and jurisdiction of said justice of the peace; that it would be a great hardship and expense for all of the relators to suffer arrest upon said charge and appear before said justice and contest the case through the courts, and that if respondents are permitted to continue said prosecutions, numerous other prosecutions are threatened and will be begun and carried on to the great annoyance, worry and cost of relators, and an unseemly conflict will arise between the subordinate judicial officers and the executive department of the government.

"Your relators therefore show to this honorable court that in proceeding against them under the charge made in said affidavit filed with him by said Mathews, as prosecutor, the said justice of the peace is acting in excess of his jurisdiction and authority and in grievous abuse of his official power, and in order to protect your relators against the hardships, injustice and oppression involved in requiring them to defend against said pretended criminal charge predicated upon their acts in enforcing the laws of the State under the directions and by the order of the Governor thereof under the circumstances hereinbefore set forth, pray that they may have a writ of prohibition directed to the said Frank Stobie, justice of the peace of St. Louis county, Missouri, and to the respondents Mathews and Lenz, prohibiting them from taking further action in said proceedings against the relators and prohibiting said justice of the peace from taking further cognizance or jurisdiction thereof, and that this honorable court in the exercise of its superintending control over the inferior tribunals of the State, prohibit said respondents from interfering with or obstructing the relators in the performance of their duties by said criminal proceedings, and that relators be granted all such relief as may be appropri-

ate and necessary in the premises, to protect them against said unwarranted and illegal proceedings.''

The respondents demurred to the petition on the following grounds:

"1. The police force of the city of St. Louis were not given by the Scheme separating the city and county of St. Louis, the same jurisdiction in the county as in the city.

"2. The police force of the city of St. Louis are without jurisdiction in the county of St. Louis, except to enforce a warrant, or warrants for a person, or persons, charged with an offense or offenses committed in the city, a situation which is affirmatively shown to have not existed when the relators invaded the premises of the Delmar Jockey Club.

"3. The Governor of Missouri has no right or authority to call on the police force of the city of St. Louis to preserve peace and order and to suppress outlawry in the county of St. Louis.

"4. That even if the Governor had such authority, the assertions of his proclamation to the president of the board of police commissioners set out in the petition, if true, did not constitute or show a state of either lawlessness or outlawry in St. Louis county.

"5. That there is no law of Missouri which prohibits the registration of bets upon horse races, the act of the General Assembly entitled, 'An Act to prohibit book-making and pool-selling, and prescribing a penalty therefor,' approved March 21, 1905, having been enacted in violation of section 28, article 4, of the Constitution, in that it contains more than one subject, to-wit, book-making and pool-selling, which are not germane or akin in character.

"6. That the petition affirmatively shows that the relators were guilty of a trespass upon the property of the Delmar Jockey Club, in that they forced an entrance upon the premises of said Jockey Club, merely to

carry out an order or proclamation issued by the Governor of the State, which is without legal force or effect, which conferred no authority upon any of the relators, and which was merely a bombastic effusion recognizable as a warrant for official action under no rule of conduct known to the law.

"7. That so far from the respondents and especially the respondents, who were respectively a justice of the peace and constable, being without jurisdiction in the premises, the petition affirmatively shows that each was clearly within the law, that the justice was not usurping judicial power, and that there is no principle of law to which the writ of prohibition can be made applicable in the premises, or upon the facts.

"8. The petition affirmatively shows that the relators were and are possessed of a full and adequate remedy, that the case sought to be made is at best merely one of the error which could, or can be corrected on appeal, or writ of error, that the relators not being residents of the county, as their petition shows, the justice was required by the statute to immediately issue his warrant upon sworn information being made of the commission by them of a criminal offense, that the respondent, who is constable, was in duty bound to execute the writ issued to him by the justice, and that to prohibit the procedure begun, as shown by the petition, is not to prevent an unseemly conflict between subordinate judicial officers and the executive department of the State, but to involve the administration of the laws in utter confusion, to try by the writ matters cognizable only by the officers designated by the laws and determine upon prohibition an issue triable only as provided by the statute, there being no room for confusion except in the imagination of the relators and no conflict except as provided, without warrant of law, by the unprecedented tirade of the Executive.

"Wherefore respondents pray judgment," etc.

## I.

The case stands therefore for adjudication upon the `petition and the demurrer thereto.

Under the code practice in this State the rule obtains that the pleading should be liberally construed. [Foster v. Railroad, 115 Mo. 165; Overton v. Overton, 131 Mo. 559.]

The pleading is to be taken in its plain and obvious meaning, giving such interpretation to it as fairly appears to have been intended.  [Law v. Crawford, 67 Mo. App. 150; Hood v. Nicholson, 137 Mo. 400.]

A demurrer admits every material allegation of the petition.   [Goodson v. Goodson, 140 Mo. 206; Shields v. Johnson County, 144 Mo. 76.]

A demurrer admits all facts which are well pleaded, and also all facts which are necessarily implied from the direct averments of the pleading.  [Weaver v. Harlan, 48 Mo. App. 319; Hood v. Nicholson, supra.]

A demurrer does not admit mere conclusions of the pleader from facts stated.   [Newton v. Newton, 162 Mo. 173; Hand v. St Louis, 158 Mo. 204; Knapp, Stout & Co. v. St. Louis, 156 Mo. 343; State ex rel. v. Aloe, 152 Mo. 486.]

Under the code, pleadings should not be construed most strongly against the pleader. The language of the pleading should be taken in its plain and obvious meaning, and such an interpretation given it as fairly appears to have been intended by its author. [Stillwell v. Hamm, 97 Mo. 579; Sumner v. Rogers, 90 Mo. 324.]

Where a pleading is assailed on demurrer, the court should lean toward, rather than against, the pleader, in obedience to the modern rule of giving him the benefit of every reasonable intendment and presumption.  [Hood v. Nicholson, 137 Mo. 400.]

Section 592, Revised Statutes 1899, provides that the petition shall contain "a plain and concise state-

ment of the facts constituting the cause of action, without unnecessary repetition."

The rule, therefore, deducible from the statutes and decisions of this State is, that pleadings must be read liberally; must not be sourly construed; must be taken in the sense fairly intended by the pleader, and when they are attacked by demurrer all the facts which are well pleaded, and all the facts which may fairly be deducible from the facts pleaded are confessed, and the courts must lean toward rather than against the pleader.

It is in the light of these rules and principles that the petition in this case must be construed. The facts stated in the petitition may be briefly summarized as follows:

First, the Delmar Jockey Club is a corporation organized under the laws of this State. One of the purposes set forth in its articles of association is to own race tracks and grounds and to engage in pool-selling, book-making and registering bets upon the exhibition of speed and on races at said tracks and premises, and to let the right to others so to do. The tracks of said club are located partly in the city of St. Louis and partly in the county of St. Louis. The bets, pool-selling and book-making are had upon the portion which lies in the county of St. Louis. At the time the club was organized, and from thence until the taking effect of the act of March 21, 1905, the purposes and practices aforesaid of the club were lawful in this State. But on the 21st of March, 1905, the General Assembly of the State of Missouri passed an act making such acts and practices a felony, punishable by imprisonment in the penitentiary for a term not less than two nor more than five years, by imprisonment in the county jail for a term not less than six months, nor more than a year, or by a fine not less than $500, or by both fine and imprisonment. That act was in full force and effect on the 16th of June, 1905, and is still in effect. Therefore the

acts of the Delmar Jockey Club, charged in the petition, were felonies under the laws of this State, and the club had no legal right to practice the same or to permit others so to do. The act is now a law of this State, and has been declared by this court to be a valid, constitutional act. [State ex inf. Attorney-General v. Delmar Jockey Club, 92 S. W. 185.]

In this condition of affairs the Governor of this State, on the 21st of July, 1905, issued a proclamation, communication, letter, order, or whatever other name may apply to it (the designation is wholly immaterial), directed to the president of the board of police commissioners of the city of St. Louis, in which he recited that such acts and practices were being had, done and permitted by the said Delmar Jockey Club, and the laws of the State were being disregarded and nullified, and that the local officials of St. Louis county either cannot or will not uphold the laws there; and that such conditions cannot be tolerated in Missouri; and acting upon his conception of his sworn duty as the chief executive of the State to execute the laws, he directed the metropolitan police force of the city, in order to maintain the peace and dignity of the State and to preserve the majesty of its laws, to proceed to Delmar race track and arrest all persons feloniously registering bets, and to continue so to do, from day to day, so long as "the felonies are committed."

The president of the board of police commissioners then instructed the chief of police of St. Louis to comply with the Governor's directions, and the chief of police ordered the relators so to do. The petition charges that the relators personally knew, or had reasonable cause to believe, that such offenses were being committed within the premises of the Delmar Jockey Club. The relators proceeded to said premises and demanded admission thereto. The Delmar Jockey Club refused to permit them to enter upon the premises, and thereupon the relators let down and unclasped the chain across the

entrance to said race track, and went into the enclosure, without injuring any of the property of the Delmar Jockey Club, or of anyone else, for the sole purpose of arresting persons engaged on the premises in violating the laws of the State.. Thereupon respondent, William Mathews, moved thereto, so far as the petition shows, without any personal interest in the matter and without being aggrieved personally by the acts of the relators, and as the petition charges, for the sole purpose of hindering, impeding and obstructing the relators in the performance of their duties, and to thwart and render of no avail the efforts of the Governor of the State to enforce the law, and to protect from arrest persons engaged upon said race tracks in violating the act of March 21, 1905, filed an affidavit before the respondent Stobie, as justice of the peace, charging relators with violating section 4573, chapter 60, Revised Statutes 1899, by throwing down or opening the doors, bars or gates aforesaid; and without referring the affidavit to the prosecuting attorney of the county, the justice of the peace issued a warrant for the arrest of the relators, and delivered the same to the respondent Lenz, as constable, and he was, at the time of the issuance of the preliminary rule herein, undertaking to arrest the relators under said warrant, to the end that they should be personally prosecuted as for a misdemeanor; and the petition charges that the respondents were also threatening to institute and prosecute similar proceedings against the relators as often thereafter as relators undertook to enter upon said premises of the Delmar Jockey Club for the purpose aforesaid.

The respondents criticise the petition on the ground that it does not charge that the acts set out in the communication or order of the Governor, were in fact true; that the recital of such facts in the communication of the Governor, which is set out in full in the petition, does not constitute a sufficient statement of

facts by the pleader. This criticism is hypercritical and untenable for these reasons:

First, the petition states facts sufficient to constitute a cause of action even if the communication of the Governor be eliminated therefrom or disregarded;

Second, the petition primarily alleges substantially the same facts that are set out in the communication of the Governor;

Third, the evident intention of the pleader, gathered from the whole plea, was to charge the existence of all the facts stated in the communication from the Governor; and

Fourth, the fair and reasonable inferences of fact from the facts stated in the petition, outside of the communication of the Governor, sufficiently show all the facts which are stated in the communication from the Governor. But if this be not true, then this case, being of such great public concern and moment, ought not to pass off upon any such narrow ground, but leave should be granted to the relators to amend the petition so as to affirmatively and expressly allege, in unmistakable terms, the existence of the facts stated in the communication of the Governor. Fairly and reasonably construed, however, the petition does state, independently of the communication of the Governor, all the facts or reasonable inferences of fact, which are contained in the communication of the Governor, for if, as the petition charges, the acts and practices and offenses against the law set out in the petition, were practiced by the Delmar Jockey Club or permitted by it, then it necessarily follows that the officers of the county either could not or would not enforce the law, and hence the duty of enforcing the law rested somewhere, upon some officer of the State, and the duty rested upon some court to take some step for the enforcement of the law in that county, and for the protection of the law-abiding people of the county, who were unable to protect them-

selves, and whose officials either would not or could not protect them.

The conclusion, therefore, is inevitable that the petition stated a clear violation of the laws of this State, and an inability or unwillingness of the law officers of the locality to enforce the laws.

## II.

The justice of the peace had no jurisdiction to entertain or attempt to determine the pretended case instituted before him by respondent Mathews. Respondents claim that the proceeding before the justice of the peace was a criminal proceeding as for a misdemeanor, and that as a justice of the peace undoubtedly has jurisdiction of that class of cases, prohibition will not lie to prevent his so doing.

Unquestionably justices of the peace have jurisdiction in misdemeanor cases, and the general rule of law is that when the jurisdiction of a court over the class of cases to which the particular case belongs, exists, prohibition will not lie. As will be hereinafter pointed out, however, there are well-known exceptions to this rule, which have been recognized by the courts of England, America and of Missouri.

The underlying and fundamental error of the respondents' contention, however, is that the proceeding before the justice of the peace, sought here to be prohibited, is not a criminal proceeding at all and is not a misdemeanor or a crime of any kind under the laws of this State; and the justice of the peace had no jurisdiction whatever to entertain a proceeding under section 4573, Revised Statutes 1899, at the instance of Mathews, or any other informer, but was only authorized to proceed for a violation of that section at the instance of the party aggrieved or injured, which in this case was the Delmar Jockey Club, and not Mathews.

An examination and review of the origin, development and present condition of the law with reference to

such trespasses as are covered by section 4573, and as are alleged in the petition to have been committed by the relators in this case, will clearly and conclusively demonstrate that the acts of the relators charged in the information or affidavit before the justice of the peace, do not constitute misdemeanors or crimes of any kind under the laws of this State, and will moreover demonstrate that the suit is a penal suit and not a criminal suit, and all proceedings for the enforcement thereof are civil proceedings and not criminal proceedings, and furthermore that no proceeding or right of proceeding can be had, under the statute, by any person whomsoever, except the party injured, and that no citizen without interest in the property trespassed upon has any right to institute any proceeding of any character for the correction of the civil wrongs prescribed against by that section of the statutes.

With amendments hereinafter noted, and which are immaterial in this case, what are now sections 4572, 4573 and 4574 are substantially the same as the original act in relation to trespass, enacted by the Territorial Legislature of Missouri on the 30th of January, 1817.   [Laws 1804—24, p. 524.]

Section 1 of the act of 1817 covered all of section 4573 down to the first proviso thereof, and also embraced substantially all of what is now section 4572.   In other words, these two sections of the revision of 1899 were originally embraced in one section of the original act of 1817.   Section 2 of the act of 1817 provided: "All penalties contained in the first section of this act, shall be recoverable, with the costs of suit, by action of debt, founded on this statute, brought before any justice of the peace of the township where the defendant resides," etc.   The original act, by section 2, further provided that if the sum demanded exceeded twenty dollars, the plaintiff might bring an action of trespass in any court of record having jurisdiction of the same.

194 Sup—6

It further provided that if the defendant set up title
to the land, the justice should require him to enter into
a recognizance in a sum sufficient to cover the amount
of the penalty or penalties sued for, with costs, to
prosecute to effect his claim or title to the land within
one year thereafter, or to appear and defend the action
to be instituted against him within one year thereafter,
and in either case to satisfy the judgment of the court,
and upon the giving of such recognizance, the justice
was required to proceed no further with the case. Sec-
tion 4 of the act provided that if the slave of any per-
son committed the trespass, the master should be liable
therefor.  Section 5 of the act provided that in all ac-
tions under the statute it should be lawful for the defen-
dant to plead the general issue and to give any special
matter in evidence, giving the plaintiff notice, in writ-
ing, at the time he entered the plea of the general issue,
of the points of the special matter intended to be given
in evidence.

Thus it appears that the action was a civil action of
debt before a justice of the peace, or of trespass in a
circuit court.

The act of 1817 was carried into the revision of
1825 (Laws 1825, p. 781) without change.  In the revis-
ion of 1835 (R. S. 1835, p. 612) section 1 of the origi-
nal act was divided into two sections, which were sub-
stantially what is now section 4572, and literally what
is now section 4573, down to the first proviso thereof.
In the revision of 1835, section 2 of the original act was
made section 3 and was changed so as to provide that
"all penalties contained in the preceding sections, may
be recovered by an action of trespass or debt, founded
upon this statute, in any court having jurisdiction of
the same." The provisions of the original act with re-
ference to the proceedings in case the defendant
claimed title to the land, were omitted, and in place
thereof it was provided that if upon the trial it ap-
peared that the defendant had probable cause to believe

that the land on which the trespass was committed, was his own, the plaintiff should recover single damages only. The provision of the original act, making the master liable in case the trespass was committed by his slave, was retained. Sections 1 and 2 of the revision of 1835 were carried into the revision of 1845 without change.    [R. S. 1845, p. 1068.]    Section 3 was amended so as to read as follows: "All penalties contained in the preceding section, may be recovered by an action of trespass or debt, founded on this statute, or by indictment, at the option of the party injured, in any court having jurisdiction of the same; when the proceeding is by indictment, such penalties shall be paid into the county treasury." In other respects the revision of 1845 contained the same provisions in this regard as the revision of 1835.   The law as it then stood came before this court in Ellis v. Whitlock, 10 Mo. 781. That was an action of debt. It was objected that trespass and not debt was the proper remedy. The lower court sustained a demurrer to the petition on that ground.    That judgment was reversed by this court, and it was held that debt or trespass might be maintained, and that the word "section" should be read "sections" as it was in the revision of 1835. Thus the action was treated in that case, by this court, as a civil action for the recovery of a statutory penalty and not as a criminal action in any sense.

In the revision of 1855 the first and second sections were the same.   The third section was amended so as to read, "All penalties contained in the preceding section may be recovered by civil action, founded on this statute, or by indictment, at the option of the party injured, in any court having jurisdiction of the same; and when the proceeding is by indictment, such penalties shall be paid into the county treasury." In all other respects the law remained unchanged.   [R. S. 1855, p. 1552.] In the revision of 1865 the first, second, third and

fourth sections remained the same. The provision as to trespass by a slave was omitted.

The revision then contained sections 5 to 8 inclusive. Section 5 provides, that if any person shall open any shaft, mine, etc., under the surface of land belonging to another, and take away any mineral therefrom, he shall be adjudged guilty of a misdemeanor and be punished accordingly. Section 6 provides: ''Every person who shall be guilty of a misdemeanor, as prohibited by this chapter, or against whom a judgment shall be obtained under its provisions, who shall fail to pay the amount of the fine or judgment, with costs, shall be committed, by the court before whom the trial is had, until such judgment and costs are paid, or is relieved under the provisions of the law in regard to insolvent debtors.'' Section 7 provides that in all cases of conviction under this act the person shall be sentenced to imprisonment until the fine and costs are paid, but the court may commute the fine to imprisonment not exceeding twenty days. Section 8 provides that if any person shall maliciously and wantonly damage or destroy any personal property, etc., the party so offending shall pay to the party injured double the value of the thing damaged, and upon affidavit that the damage was wantonly or maliciously done, it shall be a good ground for an attachment to issue, as in other cases by attachment. [G. S. 1865, pp. 379, 380.]

Those four sections are now sections 4576, 4577, 4578 and 4579 of the revision of 1899.

Section 5 (now sec. 4576) is substantially the same as section 1 of the act of February 20, 1857 (Laws 1856-7, p. 81), except that in the original act the fine was fixed at a sum not to exceed five hundred dollars.

It is now suggested that these provisions of the revision of 1865 operated to convert the proceedings under the prior sections, being the act of 1817 as amended, as hereinbefore shown, from a civil into a criminal pro-

ceeding. It is easy to demonstrate that this is a misapprehension.

FIRST. Section 5 (now sec. 4576) declares that it shall be a misdemeanor for a person to open any shaft, etc., on the land of another. This is the only part of that chapter which declares any act to be a misdemeanor.

SECOND. Section 6 simply says that if a person shall be convicted of a misdemeanor, as prohibited by this chapter, or if a judgment is obtained under the provisions of that chapter, and the defendant shall fail to pay the amount of the fine or judgment, he shall be committed until the same is paid, etc. The only misdemeanor prohibited by that chapter was the misdemeanor specified in section 5 of the act, in reference to the opening of a mine, etc. Therefore the misdemeanor spoken of in section 6, as prohibited by this chapter, could only mean the misdemeanor created by section 5. That such was the intention of the lawmakers is clear from the fact that section 6 refers not only to misdemeanors prohibited by that chapter, but to judgments obtained under the provisions of that chapter, thereby clearly differentiating between misdemeanors and judgments for penalties for the violation of those acts which had been brought down to that time by the several revisions from the original act of 1817.

Section 7 of the act provides that in case of conviction under the act, the person shall be sentenced to imprisonment until the fine and costs are paid, etc. This could not refer to anything else except a conviction of the misdemeanor under section 5, for it refers to the "fine," and section 5 is the only section of the whole chapter which declares an act prohibited to be a misdemeanor, and section 6, as above shown, differentiates between a fine and a judgment.

The General Statutes (sec. 65, chap. 201, p. 791, G. S. 1865) provided that every person convicted of a misdemeanor, where the punishment was not prescribed

otherwise, should be imprisoned in a county jail not exceeding one year, or be fined not exceeding five hundred dollars, or by both fine and imprisonment. Therefore, under section 5 of chapter 76, in the revision of 1865, as the punishment was not prescribed, the person convicted could have been imprisoned for one year, and fined not exceeding five hundred dollars, or both.

Now it is manifest that under section 6 or section 7 a person who violated the provisions of section 1 or 2, being the act of 1817 as amended, could not be punished by fine not exceeding $500, or be imprisoned or both, because those sections expressly provided that if he violated section 1 he should pay to the injured party treble the amount of the value of the thing damaged, and under section 2 it was provided that he should pay to the party injured the sum of $5 and double the amount of the damages the party might sustain. It is manifest, therefore, that the punishments prescribed by sections 1 and 2, which, in section 3 are called penalties, could not be enforced if the penalties prescribed for a misdemeanor, and contemplated by sections 5, 6 and 7, were to be applied. In other words, to so construe the statute would be to make the acts prohibited punishable in two essentially and diametrically opposite methods.

THIRD. In the revision of 1865 it was provided by section 5, chapter 224, that "the provisions of the general statutes, so far as they are the same as those of existing laws, shall be construed as a continuation of such laws, and not as new enactments."

Thus we have the legislative declaration, that sections 1, 2, 3 and 4, of chapter 76, which were mere continuations of the provisions of the general law in respect to such trespasses, should be construed as a continuation of the provisions of the prior law and not as new enactments, and that the misdemeanor contemplated by sections 5, 6 and 7, of chapter 76, of the revision of 1865, were confined to the new offense first created by the act of 1857, and carried into the revision

of 1865, and made section 5 of that act. No other construction than this can harmonize all of the provisions of that revision. This construction emphasizes and accentuates the construction herein placed upon the law, to-wit, that as to trespasses of the character of that here involved, they are not either expressly or inferentially made misdemeanors by law, but that they are what they have been ever since 1817, mere civil wrongs.

But even conceding that such is not the true construction or meaning of the law, and conceding that since 1865 the acts here complained of, arising under section 4573, amount to a misdemeanor, and conceding that justices of the peace ordinarily have jurisdiction in misdemeanor cases, nevertheless, section 4564 provides that the penalties prescribed for the doing of the acts here complained of might be recovered by civil action, or by indictment or information, "at the option of the party injured." In other words, the Legislature has given the right to institute a civil action or to initiate an indictment or information, and the right so to do is limited expressly, by the statute, to the person injured. It is no answer to this to say that ordinarily a grand jury has the right to indict without being moved thereto by any one, and that the prosecuting attorney has the right to lodge an information even at his own instance. For the Legislature has seen fit, in respect to this particular class of offenses, to say that no proceeding for righting the wrong done shall be begun by any one except the party injured, and that he has the option to determine whether that proceeding shall be a civil or a criminal proceeding. The whole matter, then, resolves itself into this: Had the Legislature the right to thus make an exception of such cases, so that ordinary rules in reference to indictments or informations for misdemeanors, should not apply? No constitutional prohibition against legislation of this character can be found. The Legislature had the same right to limit the right to initiate proceedings, whether civil or criminal,

in cases of this kind, to the party injured, as it had to confer upon prosecuting attorneys, or informers, or grand juries, the right to initiate proceedings in ordinary cases. The power of the Legislature to enact the law being given, the result inevitably follows that in this case there was no valid criminal proceeding for a misdemeanor instituted before the justice of the peace, and, therefore, he acquired no jurisdiction in the premises.

The only change made by the revision of 1879, was in reference to the third section, and for the first time, it was provided that the penalty prescribed in the original act might be recovered by a civil action founded on the statute or by indictment or *information* at the option of the party injured. The provision in reference to the penalties being paid into the county treasury, if the proceeding was by indictment, was retained. Nothing was said about who should recover the penalties if. the proceeding was by information, but it may be assumed that the penalty went to the county. In 1883 the second section was amended by inserting all that now appears in section 4573 in the proviso which relates to fences erected across water courses, and is not material in this inquiry.

The law as it was in the revision of 1879, and amended by the act of 1883, was then carried into the revision of 1889. [R. S. 1889, p. 2004.] There was no change in the revision of 1899. [R. S. 1899, p. 1090.]

Thus it appears that there has been no change in the law as it is expressed in section 4573, so far as is material in this case, since the original adoption thereof in 1817. From time to time the manner of enforcing the penalties prescribed by that law have been changed. Originally an action of debt before a justice of the peace, or in trespass before a court of record, were the only remedies, and the action was purely and solely a civil action for the recovery of the penalty and for double damages. Afterwards, in the revision of 1835,

an action of trespass or debt for the recovery of the penalty by the party injured was given. Still the action was purely a civil action, and the right of action was given only to the party injured. In the revision of 1845 a remedy by an action of trespass or debt, founded on the statute, or by indictment, at the option of the party injured, was provided, and in case the proceeding was by indictment the penalties were to be paid into the county treasury. In 1855 the remedy was by civil action or indictment at the option of the party injured. In the revision of 1865 the remedy was by civil action, indictment or information at the option of the party injured. And this has been the language of the law ever since, and is the language of section 4574 of the revision of 1899. Section 4573, therefore, from the beginning, expressly provided that if any person shall voluntarily throw down or open any doors, bars, gates or fences, etc., "he shall pay to the party injured the sum of $5, and double the amount of damages he shall sustain by reason of such doors," etc., having been opened, and the right to recover the penalties was thus conferred upon the party injured, and upon him alone, and may be enforced by civil action, or by indictment or information, at the option of the party injured. Nowhere in the law, from its inception up to this time, can there be found any expression of legislative will that such an act shall be treated or regarded as a criminal act or as a misdemeanor. All the way through the history of legislation the idea has been preserved that the proceeding is to recover a penalty or forfeiture and damages. The only ground for contention that the act is in any respect or sense a criminal proceeding, is that the penalties may be recovered by indictment or information, or by civil action at the option of the party injured, and those words added to the original statute do not change the character of the offense nor make that a criminal which was theretofore simply a civil wrong.

There is a vast and well-defined difference between

a penal statute and a criminal statute.  In Atcheson v. Everitt (1 Cowp. 382), Lord MANSFIELD said: ''There is no distinction better known than the distinction between civil and criminal law, or between criminal prosecutions and civil actions.  Mr. Justice BLACKSTONE, and all modern and ancient writers upon the subject, distinguish between them.  Penal actions were never yet put under the head of criminal law or crime.  The construction of the statute must be extended by equity to make this a criminal case.  It is as much a civil action as an action for money had and received.  Blackstone defines penal statutes as 'such acts of Parliament whereby a forfeiture is inflicted for transgressing provisions therein enacted.' ''  [3 Black. Comm. 160.]

In 16 Enc. of Pl. and Pr., page 231, a penal statute is thus defined: ''A statute properly designated as penal is one which inflicts a forfeiture of money or goods by way of penalty for breach of its provisions, and not by way of fine for a statutory crime or misdemeanor.  A penal action is a civil suit brought for the recovery of this statutory forfeiture when inflicted as punishment for the offense against the public.  Penal actions are civil actions on the one hand closely related to criminal prosecutions, and on the other, to actions for private injuries, in which the party aggrieved may, by statute, recover punitive damages.''

And this is the view taken by this court in Parish v. Railroad, 63 Mo. 284.

The Enc. of Pl. and Pr., at page 234, vol. 16, further says: ''The comprehensive meaning given to the word 'penal' in common usage, and the indiscriminate use of the words 'penalty,' 'fine,' and 'forfeiture,' make it difficult at times to determine whether a statute should be enforced by a criminal prosecution or a penal action.  With reference to penal actions the word 'penalty' means the forfeiture inflicted by a penal statute; the word 'fine,' a sum of money imposed by a criminal law.  The use of these and other technical words or

phrases will frequently determine the form of action as respectively civil or criminal.''

The same author, at page 235, says: ''Where the sum given by the statute is called damages by it, the fact will not prevent its being a penalty to be recovered by a penal action, if such is its real nature.''

The same author further says, at page 237, that in penal actions a nonsuit may be suffered by the plaintiff as in other civil actions, and also that the defendant is not entitled to be confronted in open court by the witnesses against him, as in criminal prosecutions, but the evidence may be taken by deposition. And further says that ''in some instances a general statute or the penal statute itself designates a form of civil action which shall or may be pursued.'' The same author at page 239 says: ''Where the remedy is prescribed by the statute which denounces the offense, no other process or procedure can be made use of to enforce obedience to the statute than that which the statute itself prescribes. The remedy must be sought in the precise mode and subject to the precise limitations provided by the act which creates the offense.''

And this is in harmony with the general rule of law that where a new offense is created by statute and the remedy for the enforcement thereof is provided by the statute creating the offense, the remedy so provided is exclusive. [King v. Marriot, 4 Mod. Rep. 144; Sutherland on Statutory Construction, sec. 208; Sedgwick's Statutory and Constitutional Law (2 Ed.), pp. 341 and 343; Endlich on Interpretation of Statutes, sec. 465; Smith on Modern Law of Municipal Corporations, sec. 547; Riddick v. Governor, 1 Mo. 147; 26 Am. and Eng. Ency. of Law (2 Ed.), 658, 671.]

In speaking of the remedies available for the enforcement of penalties and forfeitures prescribed by a statute, the Enc. of Pl. and Pr., vol. 16, page 242, says: ''A criminal prosecution by indictment will not lie where the form of penal action which shall be pursued

is designated by the statute. If the statute, in addition to giving a form of action, uses general words which show that no proper proceeding is intended to be excluded, an indictment as well as a penal action will lie.''

In People v. Brown, 16 Wend. 561, it was said: ''It was admitted that where an act is not an offense at common law, but is made so by statute, an indictment will lie where there is a substantive prohibitory clause, but that it is otherwise where the statute is not prohibitory, and only inflicts a forfeiture for the doing of a specified act, and provides for the remedy.''

In State v. Huffschmidt, 47 Mo. 73, the defendant was indicted and convicted for selling liquor on Sunday. He appealed on the ground that the offense was not an indictable one. The judgment was reversed by this court, the court saying, ''The Attorney-General contends, and so the court below held, that a statutory offense, where no remedy or mode of punishment is provided, may be prosecuted by indictment, or any other common law remedy adapted to the case. This is a sound view, but will not avail the State in this case, from the fact that another remedy is provided.'' And it was held that only a civil action was authorized by statute and that a criminal prosecution would not lie in the state of the statutory law at that time. It was further held, ''that if an act, which is not indictable at common law, is prohibited by statute, and a particular method of proceeding is given by the statute, that method must be pursued, and an indictment will not lie unless expressly provided for by the act; although if the act is merely prohibited and no method of proceeding is pointed out, an indictment will lie. In the revision of 1855 the offense with which defendant is charged is made so by the same act which provides for the civil remedy spoken of; and inasmuch as the section providing for an indictment has been repealed and not re-enacted, the civil remedy is alone left.''

It will be observed that the original act of 1817, and subsequent enactments until 1845, gave only a civil right of action to the party injured by the trespass denounced by the law. The reason therefor is manifest. The trespass was upon private property and the injury resulting therefrom was a private and not a public injury. Hence the law provided for a forfeiture of $5 and the payment of double damages to the party injured; and such is the language of the law up to this time. In 1845 the law was amended so as to permit the penalties denounced by the act to be recovered by a civil action or by indictment, at the option of the party injured. In the revision of 1865 it was further amended so as to permit such penalties to be recovered by information. But the addition of the remedy by indictment or information did not make the offense a criminal one, nor did it change the original character of the offense. The offense is not one which is prohibited. The statute only inflicts a forfeiture for the doing of the act of trespass. Penalties and forfeitures have ever been recoverable by civil actions or by indictments or information, but the form of the remedy does not change the character of the offense, nor does it make that criminal which before the change of the remedy was simply a civil wrong. In every case in which a new offense is created by statute and a penalty prescribed, the lawmakers have expressly declared it to be a misdemeanor if it was intended to be a crime or public offense and not merely an invasion of a private right of a citizen.

This is illustrated in reference to the action of trespass. The amendment of the trespass act first found in the revision of 1865, now sections 4576 to 4579, revision of 1899, relating to the opening of any shaft, mine or quarry, expressly declared that the party offending should be adjudged guilty of a misdemeanor. The original act of 1817 contained no such provision but left the offense a pure invasion of private rights.

The general rule of law in such cases is thus stated in 16 Enc. of Pl. and Pr., page 243: ''Where the statute creates a new public offense, an action at common law will not usually lie at the suit of the party aggrieved, but the penal action is exclusive. It is otherwise, however, if the purpose of the enactment is to confer a private right in addition to inflicting punishment.''

In Taylor v. Railroad, 45 Mich. 74, COOLEY, J., in speaking of the test to be applied in determining whether the party injured may have an action at common law, said: ''The nature of the duty and the benefits to be accomplished through its performance must generally determine whether it is a duty to the public in part or exclusively, or whether individuals may claim that it is a duty imposed wholly or in part for their special benefit.''

Chitty in his work on Criminal Law, volume 1, page 163, says: ''Where a statute prohibits an act to be done under a certain penalty, though no mention is made of indictment, the party offending may be indicted and fined to the amount of the penalty; but where it is merely provided that if any person do a certain act, he shall forfeit a sum to be recovered by action of debt, etc., no indictment can be supported. And where a statute creates an offense, and points out a particular mode of punishment, as by information, or conviction before a magistrate, this proceeding cannot be maintained; but the specific mode pointed out in the act must be observed.''

Thus it appears that the statute creates only a civil right in favor of the party injured and that the proceeding for the recovery of the penalty and double damages allowed by the act, must be initiated by the party injured and by no one else, not even the State. And further that whether the action be a civil action or an indictment or information the sum recovered is a penalty, forfeiture or damage, and that the party injured has

the option, under the statute, to determine the character of the action that shall be instituted. In any case the action is civil and not criminal, and the right of action and the proceedings asserting the right arise solely from the act in question. It follows that the provisions of sections 2748, 2749, 2750, of article 12, chapter 16, of the revision of 1899, conferring jurisdiction upon justices of the peace for misdemeanors, and prescribing that any person may file an information before the justice, have no application to the case of actions arising under section 4573, Revised Statutes 1899.

It clearly and conclusively appears from the petition that Mathews was not the party injured in this case. The Delmar Jockey Club owned the premises and the gate, or chain, which is alleged to have been opened or thrown down by the relators. The right of action, under the statute, is conferred only upon the party injured. Therefore, the Delmar Jockey Club, being the party injured, if any one, is alone entitled to maintain any kind of an action for the recovery of the forfeiture, penalties and damages. So far as appears, Mathews is a pure stranger to the trespass. The statute does not confer upon him, or any other mere informer, the right to institute such an action. This being true, the justice of the peace acquired no jurisdiction of the suit in question against relators; and this is true notwithstanding the justice would have jurisdiction if the Delmar Jockey Club had filed the information or instituted the action. The right to maintain the action being vested by the statute solely in the party injured, the justice of the peace was wholly without jurisdiction to issue a warrant at the instance of anyone except the party injured. Being a court of limited jurisdiction, and the right of action in such cases being confined to the party injured, the jurisdiction of the justice must affirmatively appear. Instead of so affirmatively appearing, it affirmatively appears that the justice had no jurisdiction.

For the foregoing reasons the conclusion logically, legally and necessarily results, under the view of any well-considered case that was ever decided by the courts of England, America or Missouri, that prohibition is the proper remedy, and that the relators are not reverted to an appeal or writ of error to be relieved against the action attempted to be instituted against them before the respondent justice of the peace.

## III.

PROHIBITION. The foregoing considerations logically, legally and mathematically demonstrate that the preliminary rule in prohibition should be made absolute. But without such considerations there are other considerations equally cogent why the rule should be made absolute in this case.

The importance and magnitude of the question involved in this case cannot be overestimated or overstated, and the results following from the decision of the questions here presented are so far-reaching and vital to the peace, good order and welfare and interest of the State and all the law-abiding people therein, as to demand the most careful, conservative and thoughtful consideration and adjudication. No more important case was ever presented to this court for determination.

The contention is made in this case that the proceeding is a criminal one as for a misdemeanor, and that a justice of the peace has jurisdiction in that class of cases, and hence that the writ of prohibition will not lie to prohibit the justice from proceeding, but that such considerations end the case.

The limits of a single opinion forbid a full discussion of the broad and important questions arising in prohibition cases. The writ of prohibition is a prerogative writ issued out of a superior court and directed to a judge of an inferior court, or to a party to a suit in an inferior court, or to any person whom it may con-

cern, commanding that no further proceedings be had in a particular case. [10 Enc. of the Laws of England, p. 489].

The writ is as old as the common law itself. The oldest authentic instance of the grant of such a writ was against the bishop in the third year of the reign of Edward III. [2 Rolle Abr. 1668, p. 281].

Originally in England the writ was most frequently employed against the ecclesiastical courts to restrain them from acting without jurisdiction or in excess of jurisdiction, and while it never issued for the correction of mere errors or irregularities, it was frequently employed in England where the inferior court proceeded contrary to the course of the common law, or in violation of the principles of law and even inferior courts of law were prohibited when so acting. The remedy by prohibition was always regarded in England, and still is so regarded in this country, as preventive rather than corrective. It is the counterpart of mandamus. It prevents action, while mandamus commands action. It is a common law writ and operates upon courts, or others exercising judicial functions, and it is as to courts what an injunction is to individuals. In later days in England, under the Judicature Act of 1873, it is not uncommon for the writ of prohibition to be accompanied with a writ of injunction. The general rule both in England and America is that a writ of prohibition will not lie where the inferior court has jurisdiction of the class of cases to which the particular case belongs. But this by no means exhausts the functions of the writ, or defines the limitations under which it may properly be invoked. The books are full of cases where the writ has been granted in cases where the inferior court has jurisdiction of the class of cases to which the particular case belongs, but in which the inferior court has acted in excess of its jurisdiction, and cases are likewise not want-

ing in which the writ has been granted where the inferior court in exercising its jurisdiction had proceeded outside of the course of the principles of law. Cases may also be found, both in England and in Missouri, where the inferior court has been prohibited from acting in cases which belong to the class of cases over which the inferior court ordinarily had jurisdiction, but where the particular case sought to be prohibited was clearly a sham proceeding, not instituted or prosecuted for public good but for ulterior and unlawful purposes to hinder or obstruct the proper administration of law. The latter class of cases constitute what may be termed exceptions to the general rule, and the writ has only been granted in extreme instances where such conditions clearly appear.

Lloyd on Prohibition, page 45, says: "Prohibition will lie in a case where the judge of an inferior court transgresses the rules which ought to govern the proceedings of all courts; or is guilty of an irregularity which amounts to an excess of jurisdiction, though the case may otherwise be within his jurisdiction."

The author discusses the subject very interestingly and cites many cases in support of the doctrine, but time and space forbid further reference to that discussion at this time.

Short on Prohibition, pages 462, 463, 491 and 492, lays down the English rule that while ordinarily prohibition will not lie where the jurisdiction of the inferior court depends upon contested facts (even though the superior court believes the lower court incorrectly decided, and if it had correctly decided, would oust the jurisdiction of the inferior court), still it will lie even in such cases where "the high court is of opinion that the judge below has perversely so decided, and has not honestly and fairly exercised his jurisdiction upon the evidence before him." Or if, "he proceeds on a wrong principle of law in arriving at his determination of the

facts" conferring jurisdiction. The author cites various instances of such cases in England.

The 23 Am. and Eng. Ency. of Law (2 Ed.), 199, says, "The writ is not confined to cases where the lower court is absolutely devoid of jurisdiction, but extends to cases where such court, although rightfully entertaining jurisdiction of the subject-matter, has exceeded its legitimate powers." At page 210 the same author lays down the rule that generally prohibition will not lie to oust the lower court of jurisdiction in a particular case, if it belongs to a class of cases of which it has jurisdiction, unless an appeal is a wholly inadequate remedy or not sufficiently speedy. The same author at page 223 lays down the rule that it will lie in cases of gross abuse of discretion in the lower court in granting equitable remedies. And at page 225, he says, the writ will lie to prevent the illegal granting of an injunction. And at page 227, that it will lie to prevent the illegal appointment of a receiver.

A few of the instances in Missouri, in which prohibition has been awarded in cases falling within the exception to the general rule, will be sufficient to point the rule.

In State ex rel. Ellis v. Elkin, 130 Mo. 90, a writ of prohibition was awarded against the county judge of Montgomery county to stop proceedings in execution of an order of the county court for the removal of the county seat, on the ground that, although an appeal would lie, that remedy was wholly inadequate and not sufficiently speedy for the protection of the public interests involved.

In State ex rel. v. Spencer, 166 Mo. 271, a writ of prohibition was awarded in a contested election case to restrain the trial court from ordering a comparison of the ballots with the poll-books and thereby disclosing how the voters at an election cast their ballots, on the ground that notwithstanding the ruling of the trial

court might be corrected on appeal, the remedy by appeal was wholly inadequate.

In State ex rel. v. Withrow, 133 Mo. 500, the writ was awarded to prevent the enforcement of a rule adopted by the circuit court which it had no power to adopt, notwithstanding the ruling of the lower court might have been corrected on appeal.

In State ex rel. McCaffery v. Aloe, 152 Mo. l. c. 483, it was said: ''Prohibition is the proper remedy to prevent a court from assuming a jurisdiction it has not, or exceeding a jurisdiction it has . . . . Prohibition is an extraordinary remedy and will not lie where the party claiming it has a remedy by ordinary means. But the ordinary means that will defeat the application for this extraordinary writ must be sufficient to afford the relief the case demands.'' In that case the writ was awarded to prevent the circuit court from entertaining jurisdiction in an injunction suit, the object of which was to prevent newly-elected appointees from qualifying and taking possession of an office.

In State ex rel. v. Wood, 155 Mo. 425, the writ was awarded to prevent the circuit court of the city of St. Louis from entertaining jurisdiction in an injunction suit to restrain the State Beer Inspector from carrying into effect the law of this State with reference to the inspection of beer.

In State ex inf. v. Talty, 166 Mo. 529, the writ was awarded against the circuit court, prohibiting it from entertaining jurisdiction in a suit by mandamus to compel the circuit attorney to institute a proceeding in the nature of a writ of quo warranto against a member of the House of Delegates of the city of St. Louis.

In State ex rel. v. Fort, 178 Mo. 518, the writ was awarded against the circuit court enforcing an order granting a change of venue in a disbarment proceeding.

In the following cases the writ was awarded re-

straining the circuit court from enforcing an illegal order appointing a receiver: Railroad v. Wear, 135 Mo. 230; State ex rel. v. Ross, 122 Mo. 435; State ex rel. v. Hirzel, 137 Mo. 435; State ex rel. v. Dearing, 184 Mo. 647.

In Thomas v. Mead, 36 Mo. 232, the writ was awarded to restrain a circuit judge from enforcing an injunction to prevent the relator from taking possession of the office of clerk of the Supreme Court.

Even more striking instances of exceptions to the general rule are to be found in the decisions in this State.

Fellows v. Goodman, 49 Mo. 62, was an action for false imprisonment. The plaintiff, with others, was engaged in taking down and removing a house. The defendant had him arrested under a warrant in a criminal proceeding before a justice of the peace. Thereafter the defendant obtained an injunction to restrain the plaintiff from removing the house. After the plaintiff had been detained in custody before the magistrate for some four hours, he was permitted to leave upon promise to return at a future day to which the hearing of the cause was adjourned. When he so returned at the appointed time he was told by a constable that the justice was holding court some four miles away. The plaintiff refused to walk that distance, and the defendant's attorney told him that the defendant did not wish to further prosecute him as they had his hands tied, having sued out an injunction against the removal of the house. The plaintiff then went away and the justice entered on his docket that he failed to appear. The plaintiff then sued for false imprisonment. In speaking of the criminal case this court said:

"It is evident that the whole proceeding before the justice was a sham; that it was instituted to stop the removal of the building until the defendant should be able to prevent it by legal process. It was not a voluntary appearance, for when the defendant and his com-

panion refused to go before the magistrate they were surrounded by a large and noisy posse, as the crowd was called, and taken there against their will. The law will not permit criminal process to be abused in this way. The justice who issued it placed himself in a delicate position, and the person who sued it out is liable in damages to those whose liberty he restrained. . . . . To this I would only add that an arrest under a sham proceeding, an abuse of the process of the court, a fictitious charge made under the forms of law, *mala fide,* is a public as well as a private wrong."

In State ex rel. Merriam v. Ross, 122 Mo. 435, a writ of prohibition was awarded against the common pleas court of Cape Girardeau, prohibiting it from enforcing an order appointing a receiver for the St. Louis, Cape Girardeau and Ft. Scott Railway Company. It appeared that some of the creditors of the railroad company had obtained from the judge of the circuit court of Stoddard county an order appointing a receiver for the road, and that before the receiver qualified and took possession, the company, itself, applied to the court of common pleas of Cape Girardeau county, a court possessed of power to appoint a receiver, to take charge of and operate the railroad for the benefit of all the creditors of the company. This court, speaking through BRACE, J., held, that whilst the court of common pleas had jurisdiction to appoint a receiver in a proper case, it had no jurisdiction to appoint a receiver at the instance of the company itself. In the course of the opinion it was aptly said:

"It is folly to attempt to disguise the fact that this proceeding was taken before Judge Ross [judge of the court of common pleas] for the express purpose of defeating the legitimate exercise of the jurisdiction of the circuit court of Stoddard county in relator's suit in that court. That of some such purpose he was advised in the beginning, appears upon the very face of the petition and that, after full knowledge that such was the ob-

ject and effect thereof, he has asserted and does still assert and maintain his right and the jurisdiction of his court over the subject-matter of that suit, so as to impede and hinder the relator in the prosecution of his suit, and the exercise of the jurisdiction of that court therein in his behalf, in a due and orderly manner, is beyond question. . . . By the Constitution this court is vested with 'a general superintending control over all inferior courts' with 'power to issue writs of habeas corpus, mandamus, quo warranto, certiorari and other original remedial writs, and to hear and determine the same.' [Const. art. 6, sec. 3.] The writ of prohibition is a familar mode of the exercise of this power, and is an appropriate one to restrain the exercise of jurisdiction by a subordinate court over a subject-matter when it has none and is loudly called for when such jurisdiction is asserted against a court that has jurisdiction and is asserting it, and when the officers of each, acting under its orders, are liable at any moment to come into physical conflict over the possession of the subject-matter in controversy.''

The foregoing, and particularly the last-cited case, fully demonstrate the existence of exceptions to the general rule of law in reference to prohibition. . The facts disclosed by the petition clearly demonstrate that even if the proceeding before the respondent justice, instituted by the respondent Mathews, be regarded as a criminal proceeding, as for a misdemeanor, nevertheless, that proceeding is a bald and transparent sham, and the petition expressly charges that it was instituted for the sole purpose of thwarting, hindering and impeding the relators in their efforts to enforce the laws of this State, and that the writ here sought is the only effective and speedy method provided by law to preserve the peace of one of the large communities of the State, and to protect the law-abiding citizens when the law officers and the lower courts of that community were either unable or unwilling to do their duty and enforce

the law, and further that the danger of a conflict between subordinate police officers and constabulary of the State was not only imminent and impending, but actually threatened.

The case at bar, therefore, falls clearly within the wise and correct view of the law expressed by Judge BRACE in State ex rel. v. Ross, supra, and imperatively demands, at the hands of this court, the issuance of a writ of prohibition to prevent the respondents from prosecuting the pretended case against the relators. This case falls within the recognized and necessary exception to the general rule in reference to prohibition. Ordinarily the motives of a litigant are of no importance in a law suit, though there are exceptions to this rule, but in a case like this, where the good name of the whole State, the welfare of the people of a large community, and the orderly and proper administration of the laws is sought to be interfered with by the issuance of a sham warrant against the peace officers of the State while in the discharge of their duties, the case is one of first importance, and would constitute, in itself, an exception to the general rules of law in reference to prohibition, even if such exception had not heretofore been recognized and enforced by this court. When the constituted authorities of a community are unable to perform their duties, or are recreant in their duties, and when the laws of this State are openly defied and violated, a condition is presented which imperatively demands extraordinary remedies adequate to meet the exigencies.

For these reasons the preliminary rule in prohibition should be made absolute in this case.

## VI.

The third and fourth grounds of the demurrer deny the right of the Governor to call on the police force of the city of St. Louis to preserve the peace and order, and to suppress outlawry in the county of St. Louis,

and assert that even if the Governor had such authority, his assertions in his "proclamation" to the president of the police commissioners, if true, do not constitute or show a state of either lawlessness or outlawry in St. Louis county.

The petition, outside of the communication of the Governor, shows in its every allegation that there were persons in the county of St. Louis engaged in committing open acts, which the laws of this State denounce as felonies, and this, too, in defiance of the local authorities. The petition therefore unquestionably states the existence of felonies in the county of St. Louis at that time. This leaves for consideration the power of the Governor to order the police force of St. Louis into the county of St. Louis to suppress the same.

The metropolitan police force of the city of St. Louis was created by the act of 1861 (Laws 1860-61, 446). Section 4 of that act conferred upon the Governor of the State the power to appoint four commissioners, who were authorized to appoint, enroll and employ a permanent police force. Section 5 of the act made it the duty of the board of police to preserve the peace of the public, prevent crime, and arrest offenders, protect the rights of persons and property, guard the public health, preserve order at every public election,   . . . enforce all the laws and ordinances of the city of St. Louis, and "in case they shall have reason to believe that any person within said city intends to commit a breach of the peace, or violation of law or order beyond the city limits, any person charged with the commission of crime in the city of St. Louis, and against whom criminal process shall have issued, may be arrested upon the same in any part of this State by the police force created or authorized by this act;" provided, that before the person arrested shall be removed from the county in which the arrest was made he should be taken before some judge or justice of the peace of that county and should not be removed from the county unless the

removal was approved by such judge or justice of the peace. The thirteenth section of the act made it the duty of the sheriff of the county of St. Louis, whenever called on for that purpose, by the board, to act under their control for the preservation of the public peace and quiet, and if ordered by them to do so, to summon the posse comitatus, and hold or employ such posse subject to their direction. It also gave the board power, whenever it deemed fit, to call out such of the military force organized and existing in the city, as they might see fit, in preventing threatened disorder or opposition to the laws, or in suppressing insurrection, riot or disorder at all times. And further, whenever the exigency or circumstances, in their judgment, warranted it, it gave the board power to assume control and command of all conservators of the peace of the city of St. Louis, whether sheriff, constable, policemen or others, and required the peace officers to obey the lawful commands of the board, subject to a penalty nominated in the statute.

By section 11 of the act of March 13, 1867 (Laws 1867, p. 179), amendatory of said original act of 1861, it was expressly provided as follows:

"The members of the police force of the city of St. Louis, organized and appointed by the police commissioners of said city, are hereby declared to be officers of the city of St. Louis, under the charter and ordinances thereof, and also to be officers of the State of Missouri, and shall be so deemed and taken in all courts having jurisdiction of offenses against the laws of this State or the ordinances of said city."

Section 3 of the act of 1867 further provided that "The board whenever and for so long a time as may be necessary, is further authorized to appoint, mount and equip not more than twenty policemen, for duty in the outskirts and open portions of the city and elsewhere in the city and county of St. Louis."

Section 12 of that act further gave the board power to regulate and license all private watchmen and pri-

vate policemen in the city of St. Louis, and prohibited any person serving as private watchman or private policeman in the city of St. Louis without first having obtained a license so to do from the board, on pain of punishment as for a misdemeanor; and the act of February 17, 1875 (Laws 1875, p. 337), enlarged the provisions last aforesaid so as to include private watchmen, private detectives and private policemen in the county of St. Louis as well as in the city of St. Louis.

Sections 20 to 25 of article 9 of the Constitution of 1875, provided for the separation of the city and county of St. Louis, and for the election of a board of thirteen freeholders to propose a Scheme therefor, and for a charter for the city of St. Louis; and further provided that if the people voted in favor of the adoption of such Scheme of separation and charter, "then such Scheme shall become the organic law of the county and city, and such charter the organic law of the city, and at the end of sixty days thereafter shall take the place of and supersede the charter of St. Louis, and all amendments thereof, and all special laws relating to St. Louis county inconsistent with such Scheme."

Section 23 provided that such charter and amendments shall always be in harmony with and subject to the Constitution and laws of Missouri. And section 25 provided that, "Notwithstanding the provisions of this article, the General Assembly shall have the same power over the city and county of St. Louis that it has over other cities and counties of this State."

The Scheme and charter thus authorized were adopted. Section 14 of the Scheme provided as follows: "The metropolitan police force of the city of St. Louis, as now established by law, shall be maintained at the cost of the city of St. Louis. Provided, however, that the metropolitan police of the city of St. Louis shall have the same power and jurisdiction in the county of St. Louis, as constituted by this Scheme, as now provided by law: Provided that upon a petition of the

county court of St. Louis county the board of police commissioners shall appoint and equip not more than twenty policemen as provided in the act approved March 13, 1867, for duty in said county. The cost of equipping and maintaining said police shall be paid by the county as herein established.''

By the act of February 5, 1864 (Laws 1863-64, p. 475), it was provided in section 3 thereof, that the county of St. Louis shall be charged with one-fourth of the whole expense of the police force of the city of St. Louis for the year 1864 and for each year thereafter, and the county court were required, from time to time, to appropriate money out of the county treasury to meet that proportion of said expense.

The validity and constitutionality of that act was challenged in the case of State ex rel. St. Louis Police Commissioners v. St. Louis County Court, 34 Mo. 546, and this court, speaking through BATES, J., held the act constitutional and the county liable therefor.

Thus the matter stood until March 15, 1899, when the General Assembly of the State passed an act of that date (Laws 1899, p. 51). The first section of that act repealed in express terms the act of March 27, 1861, and all acts supplementary and amendatory thereof. The act then practically re-enacted the old and original metropolitan police act, making changes therein, substantially only, as to the number of police and the compensation therefor. Section 25 of that act is substantially in the language of section 11 of the act of 1867, and declared the police force to be city officers and also State officers, and that they should be so taken and deemed in all courts having jurisdiction of offenses against the laws of this State, or the ordinances of the city. Section 26 preserved the old law so far as licensing private watchmen, etc., when the city was concerned. The validity of the act of 1899 came before this court, in Banc, in the case of State ex rel v. Mason, 153 Mo. 23. GANTT, J., in delivering the opinion of the

court, said: "An analysis of the act of 1899 will demonstrate that in the largest part it is identical in its terms with the law of 1861." And then after citing, analyzing and comparing the provisions of the two acts, he said: "The fundamental principles underlying the acts of 1861 and 1899, creating boards of police commissioners for the city of St. Louis, are the same, and the constitutionality of such legislation has stood the test of the most critical judicial examination and review." He then pointed out that "the protection of life, liberty and property and the preservation of the public peace and order in every part, division and sub-division of the State, is a governmental duty which devolves upon the State and not upon its municipalities any further than the State in its sovereignty may see fit to impose upon or delegate it to the municipalities. The right to establish the peace and order of society is an inherent attribute of government, whatever its form, and is co-extensive with the geographical limits thereof, and touching every part of its territory." He then exhaustively discussed the constitutionality of several laws creating such metropolitan police, and showed that the metropolitan police system prevailed in Michigan, Massachusetts, Maryland, Louisiana, Kansas and Ohio.

Starting with the truism that the purpose of a metropolitan police system is for the protection of life, liberty and property and the preservation of the public peace and order in every part, division and sub-division of the State, and that it is a govermental, inherent duty of the State to establish peace and order in every part thereof, co-extensive with its geographical limits, it follows that the State has a permanent interest in the preservation of peace and good order in every part thereof, and that it is charged with the duty of preserving the same independant of and superior to the wishes even of the people of a particular locality of the State, and it also logically follows that where the people of a locality are unable to protect themselves, by reason of

the inefficiency or recreancy of their local officers, or where such local officers cannot or will not properly discharge their duties, the duty aforesaid rests upon the State, and the exigencies of the situation demand immediate and effective action on the part of the State. Local influences and surroundings may make it impossible, or extremely difficult, for the local authorities to deal with extraordinary conditions affecting the peace, good government and order in a locality, and such conditions imperatively demand action on the part of the State. The question then arises, whose duty is it to take action? Action can only be had through the courts by the institution of proceedings in the local courts, and if the conditions in the locality are such as above described efficient remedies for existing evils manifestly could not be obtained through the courts, and especially is this true with reference to the enforcement of the criminal laws and the police laws of the State.

Under the division of powers in our form of government between the executive, legislative and judicial departments, it necessarily follows that in times of such exigencies which demand immediate action, the power necessarily rests with the executive of the State to enforce the police power of the State and to restore order in the locality. If this is not so then there is no sufficient and adequate and speedy remedy afforded by our system of government, and if this be true, then it were well that the people of this State were advised of such infirmity in our institutions, to the end that they may take speedy and effectual means to provide adequate remedies by the organic laws of the State. But it is not conceivable that our institutions are so imbecile and infirm as to be unable to grapple with and master such conditions.

Article 5 of our Constitution deals with the executive department of the State. Section 4 of that article declares that, ''The supreme executive power shall be vested in a chief magistrate, who shall be styled

'The Governor of the State of Missouri.' " Section 6 provides that, "The Governor shall take care that the laws are distributed and faithfully executed; and he shall be a conservator of the peace throughout the State." Section 7 provides, "The Governor shall be commander-in-chief of the militia of this State, except when they shall be called into the service of the United States, and may call out the same to execute the laws, suppress insurrection and repel invasion," etc.

It will be observed that nothing is said in this provision of the Constitution about the exercise of the police power of the State or of the power of the Governor with reference thereto. And it is argued that the Governor has only power to see that the laws of the State as declared by the judgments of the courts shall be executed, and that he has no power even to call out the militia to execute the law, except in furtherance of a judgment of a court; and further that whilst he is a conservator of the peace, he has no more power than any other conservator of the peace in the State.

It may be conceded that, primarily, the power is vested in the General Assembly of the State to provide by law the means and agencies for the enforcement of the police powers of the State. The General Assembly of this State has by the various metropolitan police acts hereinbefore referred to, provided means by that system for the protection of life and property and of the preservation of public peace and order, not only in the city of St. Louis, but in every part, division and sub-division of the State, co-extensive with its geographical limits, as was well said by GANTT, J., in State ex rel. v. Mason, supra. Under that act the Governor appoints the board of police commissioners and those commissioners appoint the officers. Primarily, therefore, the act confers the right and duty upon the Governor to see that the metropolitan police system do their duty. It is a part of the duty of that system to preserve the public peace in every part of the State, and all of the acts

relating to that system, including the act of 1867, and
the act of 1899, expressly declare, evidently in further-
ance of principles underlying that system, that the of-
ficers of that system shall be not only city officers but
shall be State officers, and shall be so taken and deemed
by all the courts of this State. The purpose of this
enactment is plain. It was the evident and unquestion-
able purpose of the General Assembly thus to afford
the chief executive of this State a sufficient and ever-
ready force and means for the efficient preservation
of the peace and the protection of life and property in
every part of the State. The system thus created may
be properly designated as the police arm of the chief
executive of the State, and is clearly distinguishable
from the military arm of the chief executive, composed
of the militia of the State. The police system thus
created is essentially a State constabulary, subject to
the immediate orders of the board of commissioners,
who in turn are subject to the orders of the Governor,
who appointed them, and who is responsible to the
people for their stewardship.

There can be no difference between fair-minded
men that in thus creating a State police arm, it was the
intention of the law-makers to give the chief executive
the power to discharge his duty as a conservator of the
peace. There can also be no reasonable doubt that un-
der our system of laws, the Governor is the chief con-
servator of the peace in the State, and especially in
times of local disturbances which do not amount to in-
surrection but where the local machinery of the law is
inadequate or insufficient to restore order and preserve
good government.

It has well been said that ''the office of Governor of
the State corresponds, within its particular sphere, to
the presidency of the United States, and the analogy
has frequently been noticed by the courts.'' [14 Am.
and Eng. Ency. of Law (2 Ed.), 1097.]

Mr. Sutherland in his notes on United States Con-

stitution, pages 471 to 475, and cases cited, lays down the rule that the President of the United States has power to call out the militia or to declare martial law within the territorial limits in which it may be necessary, and that he is the exclusive judge of whether the exigency of the occasion demands such action, and his decision is not subject to judicial review. In fact, the rule of law is universal that, "The executive, in the proper discharge of his duties under the Constitution, is as independant of the courts as he is of the legislature." [Cooley, Const. Lim. (7 Ed.), 162.]

This principle has been invariably adhered to by this court. [State ex rel. v. Stone, 120 Mo. 428; State ex rel. Bartley v. Governor, 39 Mo. 388.] And the same doctrine has been applied to the legislative department. [State ex rel. v. Bolte, 151 Mo. 362.]

Speaking of the executive department of the government, Judge STORY (2 Story, Const. (5 Ed.), sec. 1411), says: "The Federalist has remarked that there is hardly any part of our system, the arrangement of which could have been attended with greater difficulty, and none which has been inveighed against with less candor or criticised with less judgment."

The same author, in section 1417, says: "Energy in the executive is a leading character in the definition of a good government. It is essential to the protection of the community against foreign attacks. It is not less essential to the sturdy administration of the laws, to the protection of property against those irregular and high-handed combinations which sometimes interrupt the ordinary course of justice, and to the security of liberty against the enterprises and assaults of ambition, of faction and of anarchy. . . . . A feeble executive implies a feeble execution of the government. A feeble execution is but another phrase for a bad execution; and a government ill executed, whatever may be its theory, must, in practice, be a bad government."

It has likewise been well said that, ''The Governor representing the sovereign executive power of the State, is always virtually present in court to execute its process whenever the power of the marshal and ordinary posse may not be sufficient for the purpose, or when the peace and dignity of the State may so require.''

It is also a well-recognized rule of law that the writ of prohibition will not lie against the Governor of the State in matters pertaining to his executive functions and duties. [6 Am. and Eng. Ency. Law (2 Ed), 1020.]

From the foregoing it inevitably follows that the metropolitan police of the city of St. Louis are State officers; that they are police or constabulary officers, especially created to preserve the peace and good order in every part of the State, and that they are subject to the orders of the Governor, and were created for the express purpose of affording the Governor an efficient arm for the enforcement of the police powers of the State and that no other officer in the State, and that no other tribunal in the State, has any control over them, or power to call them into action, except the Governor, acting through the board of police commissioners appointed by him.

Judge DILLON in his work on Municipal Corporations (Sec. 60) says police officers are, in fact, State or public officers, and not private or corporation officers.

The communication of the Governor to the president of the board in this instance has been inveighed against by the defendants, and in oral argument counsel have referred to it as an unprecedented use of the metropolitan police of St. Louis by the Governor. Counsel have overlooked the fact that the history of this State of such recent date as not to be written, but as to still remain in the memory of the present generation, shows that the action of the Governor in this instance is not without precedent. In 1873 Governor Silas Woodson ordered the metropolitan police of St. Louis to go to Mob-

erly and St. Charles to quell railroad strikes then exist-
ing at those points, and the police effectually did so. In
1876 Governor Phelps ordered the police of St. Louis to
go to Johnson, Jackson, Clay, Henry and Callaway
.counties in this State for the purpose of apprehending
and arresting train robbers and other outlaws, whom the
local authorities were unable to apprehend, and the po-
lice officers did so. In the great railroad strikes of 1877,
the metropolitan police of St. Louis, together with the
police reserves called into service by the board of police
'commissioners, were used by Governor Marmaduke in
the city and county of St. Louis to restore ,order and
good government in those localities. In none of these
instances, and in fact never before this case, was the
power of the Governor thus to use his police arm for
preserving the peace questioned by any citizen or any
court. The police were then, as they are now, State
officers, and as such were subject to the control of the
Governor, and to his orders to be used in any part of
this State to preserve the peace and good government
thereof. If, instead of using the ordinary police power of
the State, the Governor had, in this instance, elected to
declare a state of affairs to exist in St. Louis county
that demanded the calling out of the militia to suppress,
there can be no question that no court would have had
power to interfere with him in so doing. If he had done
so, and if any justice of the peace had issued warrants
for the arrest of the officers and soldiers engaged there-
in, can there be any doubt that such action would have
been an illegal action, and that the officers and soldiers
would have been justified in refusing to submit to ar-
rest at the hands of the constable? And can there be
any difference in principle whether instead of using
his military arm, the Governor chose to use his police
arm, the same legal result would follow? In either
event the power of the Governor would be the same. In
either event the condition would be presented of an im-
minent danger of armed conflict between the agencies

employed by the Governor for the preservation of the peace and the constable with his posse armed with a warrant for the arrest of the military or police while so engaged. In either event a conflict would be presented such as, if not checked through the instrumentality of a writ of prohibition, as was done in this case, might have resulted in bloodshed and would probably have done so, and the good name of the State of Missouri, of which all of its citizens are so proud, would have been injured in the eyes of the civilized world.

Suppose, instead of a corporation organized as the Delmar Jockey Club was for the purpose of conducting races and registering bets thereon, an aggregation of highwaymen, burglars, murderers or other lawbreakers had established themselves in a house in St. Louis county and were engaged daily and nightly in plying their several illegal avocations; and suppose the local authorities had been unable or, for ulterior purposes, unwilling to apprehend them, enforce the laws and restore the peace of the community; and suppose such a condition had been brought to the notice of the Governor of the State, would any law-abiding citizen of this State, would any lawyer in this State, would any court in this State, have denied to the Governor the right to employ all means, police, constabulary or militia, within his reach and under his order, to cause the arrest of the persons, and to restore the peace of the community?

A Governor who would fail to act by all the means in his power under such circumstances would be justly regarded as a recreant and his administration pronounced a failure for its imbecility. No court would have issued any writ to stay the hand of the Governor under such circumstances, and it would have been the imperative duty of this court, under the Constitution, to have prohibited any inferior court that undertook to do so. There is no difference in principle between the case supposed and the case at bar.

The State is primarily bound to preserve the peace in every part of the State. The distinguishing feature between a metropolitan and local police is that the latter has no power beyond the territorial limits of the city that creates it, while the former is created by the State, as the constabulary of the State, and is the civil means created by the State for the enforcement of the police laws of the State. Reason and common sense, as well as logic, therefore, compel the conclusion that it is within the power of the State to use the means afforded by the State for discharging the State's duty to preserve the peace in all and every part of the State, unless the act creating the means expressly prohibits such use. The means being provided and the duty imposed, and the use not being expressly prohibited in this instance, it was right and proper for the Governor to employ the means not only in St. Louis, but every where else in the State. The necessities of large cities require the constant presence of a police force. Hence the State has permanently located its metropolitan police force in such large cities. Rural communities do not require or cannot afford to pay for such a permanent force. When conditions require it; when rural communities need immediate police protection; or when local officers cannot or will not enforce the law, it is not only proper and right but absolutely necessary for the Governor to use the metropolitan police. This has been the construction of the law by all Governors and their legal advisers heretofore, and the construction is persuasive although not conclusive of the meaning of the law. [Fears v. Riley, 148 Mo. 49.]

Spelling in his excellent work on Injunctions and Other Extraordinary Remedies (2 Ed.), vol. 1, sec. 628, says: "No court has jurisdiction to interfere with the public duties of any of the departments of the government, or to override the policy of the State; and a court of equity is without power to enjoin the exercise of the

police powers given by law to the officers of a municipal corporation, so as to prevent such officers from preserving the public peace, such for instance as keeping a public street open to public use. Nor will an injunction issue to restrain an interference by the police authorities with the business of a liquor dealer, by arresting him and his employees. If the arrests are illegal, habeas corpus and suits for damages will afford him ample remedy. And an injunction was refused where sought to restrain police authorities within the metropolitan police district from placing policemen in front of a public house in which guests had been repeatedly subjected to unjust, exorbitant and illegal charges, and from giving warning to strangers about to enter to be careful. Nor does it alter the case that police supervision is exercised in an arbitrary and unlawful manner.''

Without further elaboration, therefore, it results that the Governor of the State had power to order the State's metropolitan police system in St. Louis to go to St. Louis county, restore the peace and make the arrests for which they were sought to be held criminally liable by the justice of the peace, and this, too, at the instance of one who, under the statute, is given no authority whatever to institute such a proceeding, and when, so far as the record discloses, the injured party was not complaining, and when, as the petition in this case expressly charges, the purpose of the proceeding before the justice was not in the interest of good government but was for the unlawful purpose of impeding and obstructing the State's officers while in the discharge of their legitimate duties; and when the inevitable result would have been an armed conflict between the police and the constable and his posse. Under such circumstances it is the duty of this court to prohibit any inferior court from acting in the manner proposed in this case.

## V.

The demurrer further charges that the police force of the city of St. Louis had no authority or jurisdiction in the county of St. Louis, except to enforce a warrant for the arrest of a person charged with an offense committed in the city.

The powers and organization of the metropolitan police system of St. Louis are hereinbefore set out. The point of this objection raised by the demurrer is, that the act of 1899 took away from the metropolitan police the power conferred upon it by section 14 of the Scheme separating the city and county of St. Louis.

As hereinbefore pointed out, it is immaterial in this case whether this is true or not, for the act of 1899, as well as the act of 1861, and the act of 1867, expressly made the police officers State officers as well as city officers. But without this, the point made is not well taken. The act of 1899 expressly repealed the act of 1861 and all acts amendatory thereof, but the Legislature never repealed or expressed any intention to repeal section 14 of the Scheme aforesaid. That the Legislature would have had the power to do so cannot now be doubted under the provisions of section 23 and 25 of article 9 of the Constitution. The question then is whether the act of 1899 repealed said section 14 of the Scheme by implication.

It is a well-settled rule, especially in this State, that repeals by implication are not favored, and that no prior statute will be deemed repealed by a subsequent statute unless there is such inconsistency between the two that they cannot stand together. Wherever the two acts can be harmonized, the court never regard the prior statute as repealed by implication by a later statute. There can be no doubt that there is no such inconsistency between section 14 of the Scheme and the Act of 1899, as to prevent both being treated as existing laws. It has heretofore been pointed out that at the time the

people of the city and county of St. Louis adopted the Scheme and Charter, the metropolitan police of St. Louis had power to make arrests and to preserve the peace not only in the city of St. Louis but also in the county of St. Louis. Section 3 of the act of 1867 expressly conferred such power upon the police. It has also been pointed out that prior to the separation, the county of St. Louis was required to pay one-fourth of the expenses of maintaining the metropolitan police. Section 14 of the Scheme changed the law as it theretofore existed so as to require the city of St. Louis to pay the whole cost of the metropolitan police, and that section expressly provided that, ''The metropolitan police of the city of St. Louis shall have the same power and jurisdiction in the county of St. Louis, as constituted by this Scheme, as now provided by law.'' It further provided that upon petition of the county court the board of police commissioners should appoint and equip not more than twenty policemen for duty in the county and the county should pay the expense thereof. This last provision evidently contemplated a permanent police force for the county as well as the city. But read in its entirety the conclusion is irresistible and absolutely logical that it was the intention of the framers of the Scheme to preserve to the police the same power and jurisdiction in the county of St. Louis that they had before the separation, and before the separation the act of 1867 expressly gave them power in the county of St. Louis. The act of 1899 contains no provision whatever in conflict with the power and jurisdiction thus retained to the police in the county of St. Louis. There is no repugnancy between the act of 1899 and section 14 of the Scheme. The two can unquestionably stand together. It must be remembered that the Constitution expressly declared that when the Scheme and Charter were adopted by the voters, the Scheme should become the organic law of the county, and should supersede all special laws theretofore enacted in reference thereto. This made

the Scheme certainly as effective as a legislative act. The Scheme was not an amendment to the original police act, nor to any act amendatory thereof, and therefore it cannot be construed to be within the meaning of section 1 of the act of 1899, which repealed the act of 1861 and its amendatory acts.

The purpose and object of the Legislature in giving the metropolitan police power and jurisdiction in the county of St. Louis, as well as in the city of St. Louis, manifestly was because it was necessary for the efficient enforcement of the laws in St. Louis, and for the protection of the people of the county against persons who either lived in St. Louis and committed offenses in St. Louis county or vice versa. The city and county were practically one subdivision of the State at that time. Only an imaginary line divided the two. It would have paralyzed the hand of the police department if it had not had the power of arrest in St. Louis county as well as in St. Louis city, and it would have been manifestly unjust to the people of St. Louis county not to have given the police power to preserve the peace in the county as well as in the city.

The people of the county understood and appreciated the importance of these provisions of law, and in agreeing to the separation of the city from the county they took the precaution to provide in section 14 of the Scheme for the preservation of the power and jurisdiction of the police in the county as it theretofore existed, so that the separation into two subdivisions of the State should not deprive the people of the county of the benefit of the State's police located in St. Louis. Under such conditions it would be an unjust reflection upon the intelligence of the General Assembly of this State to hold that in passing the act of 1899 the members thereof intended to take away from the people of St. Louis county the police protection which the law had previously afforded them. No court under any rules of construction with reference to repeals by implication should

take away that protection from the people of St. Louis county. The fact that the city of St. Louis now pays the whole cost of maintaining the police does not in any manner affect the question of the power and jurisdiction of that police system anywhere in the State, for, as hereinbefore pointed out, this court in State ex rel. v. Mason, supra, expressly held that the metropolitan police system has jurisdiction coextensive with the territorial limits of this State, and that it is the means afforded by the State for the efficient enforcement of the laws of this State for the protection of life, property and the peace of the citizens of this State.

For these reasons it is too clear to admit of argument that the police had the power they were exercising in St. Louis county at the time the proceedings before the justice of the peace complained of in this case were instituted, and that it was the duty of this court, under the circumstances, to exercise its high prerogative by a writ of prohibition to stay the hand of the justice of the peace and the constable from interfering with or attempting to arrest the police while so doing. Under our complex system of government no other adequate or efficient remedy has been suggested or can be conceived for the correction of the evils and wrongs existing at the date of the issuance of the preliminary rule in this case; and no other means has been suggested whereby the unseemly conflict between the power of the constable and the power of the police and the Governor could have been averted and prevented.

The various acts relative to the metropolitan police system declare the police officers to be State officers, and expressly vest them with power in St. Louis county, and the act of 1899 will be read in vain for a single word expressive of a legislative intention to curtail the power previously vested. In fact, the act of 1899 was not intended to take away any powers previously conferred either as to the city of St. Louis, or as to any other portion of the State. The manifest purpose of

that act was to provide for an increase in the number and pay of the police, but not to decrease any of its powers or jurisdiction. That act was a curative, enlarging act in the respects noted, and was not intended to destroy any power the police previously had. It is inconceivable that, after the Legislature had, so many times, expressly declared that the police were State officers and should have jurisdiction and power in St. Louis county, and after that force had been so often used by the Governors of this State to restore order and suppress lawlessness in various parts of the State, the Fortieth General Assembly in 1899 should have intended to curtail the power of the police. If the Legislature had so intended, they would unquestionably have said so in express terms. The prior use of the police by former Governors had been acquiesced in and presumably approved by the people of this State, and in the absence of an express provision of statute forbidding further use on similar occasions, no court would be justified in construing the act of 1899 to have the effect to take away previously conferred powers by implication, unless there was such manifest repugnancy between the act of the Legislature and of the Scheme aforesaid as that both could not stand together, and such is not the condition here presented.

For these reasons the preliminary rule in prohibition should be made absolute, and the demurrer should be overruled. *Valliant, J.,* concurs herein.